UNITED STATES of America

v.

Alfred J. RIOUX.

No. 3:94CR–193 (EBB).

United States District Court,
D. Connecticut.

Aug. 17, 1995.

James A. Wade, Craig A. Raabe, Robinson & Cole, Hartford, CT, for defendant.

Robert M. Appleton, Assistant U.S. Attorney, U.S. Attorney's Office, Bridgeport, CT, Joseph C. Hutchison, Assistant U.S. Attorney, U.S. Attorney's Office, New Haven, CT, John C. Keeney, Nancy J. Newcomb, U.S. Department of Justice, Criminal Division, Public Integrity Section, Washington, D.C., for plaintiff.

### RULING ON MOTION TO DISMISS INDICTMENT OR JURY

ELLEN B. BURNS, Senior District Judge.

Defendant Alfred J. Rioux was indicted on September 22, 1994 for violation of 18 U.S.C. § 1952 (Travel Act) and 18 U.S.C. § 1341 (Mail Fraud). On the morning of jury selection on May 8, 1995, the defendant filed a motion to dismiss the jury pool pursuant to the Fifth and Sixth Amendments and the Jury Service and Selection Act of 1967, 28 U.S.C. § 1861 *et seq.* The court scheduled an evidentiary hearing on the motion for May

10, 1995 and proceeded with jury selection on May 8, 1995. The evidence at the hearing on May 10, 1995, continued on May 12, 1995 and May 17, 1995, included various exhibits and the testimony of Clerk of the Court Kevin Rowe.

Following the hearing, the defendant filed an amended motion to dismiss the indictment or, alternatively, the jury. After considering the evidence presented at the hearing and the briefs and supplemental briefs of the defendant and the government, the court denied the amended motion. [Doc. No. 66].

## FACTS

After an evidentiary hearing, the court makes the following factual findings with respect to the jury selection process for the New Haven division of the District of Connecticut.

### I. *The Selection Process*

The district judges of the United States District Court for the District of Connecticut adopted the Second Restated Plan for Random Selection of Grand and Petit Jurors Pursuant to the Jury Selection and Service Act of 1968 (hereinafter "the Plan") on November 23, 1992. (Def. Exh. A (SECOND RESTATED PLAN FOR RANDOM SELECTION OF GRAND AND PETIT JURORS PURSUANT TO THE JURY SELECTION AND SERVICE ACT) (AS AMENDED)). The Plan became operational on October 1, 1993. (Def. Exh. M at 5 (Magistrate Judge's Report, November 1993)).

Pursuant to the Plan, the district created a "master wheel" from the motor vehicle operators list and registered voters list of each of the political subdivisions within the district.[1]

More specifically, Clerk Rowe sent a letter to the registrar of voters for each of the 169 political subdivisions within the judicial district, requesting four percent of the names on the voter registration list or, if such were not within the technical capabilities of a given registrar, the entire list. The letter included specific instructions for random selection of four percent of the names on the list, as well as the proper format for a computer-generated list. Clerk Rowe required each registrar of voters to certify in writing that the registrar complied with the procedures outlined in the letter. (Testimony of Clerk Rowe; Def. Exh. K (Magistrate Judge's Report, May 1993)).

Each registrar of voters provided Clerk Rowe with a certified list of voters.[2] If a registrar of voters returned an entire list, the Clerk's Office randomly selected four percent of the names on the list in accordance with the instructions contained in the letter. If a registrar of voters returned only four percent of the list, the entire return was included in the master wheel. Clerk Rowe forwarded all data to the General Services Administration in New York (hereinafter "GSA") where the master wheel was created and maintained. (Testimony of Clerk Rowe).

Clerk Rowe also sent a letter and blank computer tapes to the Connecticut Department of Motor Vehicles (hereinafter "DMV"), requesting its latest list of licensed motor vehicle operators. The DMV returned five tapes containing 2,347,558 names to Clerk Rowe.[3] Clerk Rowe forwarded the tapes to the GSA with instructions to select, at random, four percent of the names on the list. The GSA certified that it selected the four percent in accordance with Clerk Rowe's instructions and included the selected names on the master wheel. (Def. Exh. K at 4).

---

1. The use of the motor vehicle operators list represented a departure from the previous plan. Section VI of the Plan states:

   The Court finds that the voter registration lists represent a fair cross section of the populace in the District of Connecticut. Nevertheless, to foster the policy and protect the rights secured by 28 U.S.C. §§ 1861 and 1862, the Court finds it necessary, pursuant to 28 U.S.C. § 1863(b)(2), to prescribe that names of prospective jurors be drawn from voter registration lists and from the list of licensed motor

   vehicle operators maintained by the State of Connecticut.
   (Exh. A at Section VI).

2. The voter records reflected registered voter information as of the fall of 1992. (Testimony of Clerk Rowe; *see also* Def. Exh. K at 2–3).

3. The motor vehicle records reflected licensed motor vehicle information as of January 1993. (Testimony of Clerk Rowe; *see also* Def. Exh. K at 2–3).

These lists comprised the sole source of names for the master wheel, completed as of May 11, 1993. (Def. Exh K. at 6).[4] The names generated by this exercise were then sorted by division: Hartford, New Haven and Bridgeport. Thus, the master wheel was subdivided into three master wheels: the Hartford master wheel, New Haven master wheel, and Bridgeport master wheel.

The GSA then randomly selected several thousand names from the New Haven master wheel in accordance with procedures provided by Clerk Rowe. (Def. Exh. M at 4). The GSA forwarded juror questionnaires to these individuals with instructions to return the completed questionnaire to the Clerk of the Court within ten days. When the questionnaires were returned, the "jury clerk" reviewed each questionnaire and divided them into three categories: qualified, unqualified [5] and uncertain. A magistrate or district judge sitting in the New Haven division then reviewed the questionnaires for a final determination of qualification.

Questionnaires that were returned to the Clerk by the United States Postal Service as "undeliverable" were mailed a second time, to a new address if such address was available or to the same address if a new address was not available. If they were returned again, they were retained in storage and included on a list of "undeliverables" categorized by community and quantity.

The court excused those who were unqualified from jury duty. The jury clerk then entered the data from the qualified questionnaires onto a computer database maintained in the Clerk's Office in New Haven.[6] These individuals formed the "qualified wheel," the source of prospective jurors for all grand and petit juries called within the New Haven division.[7]

As the pool of prospective jurors from the qualified wheel diminished, either because jurors' terms of service had expired or jurors had relocated or were disqualified or excused,[8] the Clerk of the Court ordered the GSA to mail additional questionnaires to a number of individuals randomly selected from the New Haven master wheel. The Clerk's Office completed the same process of qualification with these individuals. Thus, the qualified wheel does not remain constant

4. Prior to completing the master wheel, the GSA reviewed the lists to remove double entries (prospective jurors whose names appeared on both the DMV list and a voter registration list). (Def. Exh K at 6).

5. The Plan provides that:

"Any person" shall be qualified to serve on grand and petit juries pursuant to 28 U.S.C. § 1865 unless he/she:
(1) is not a citizen of the United States, eighteen years old, who is a resident within the judicial district;
(2) is unable to read, write, and understand the English language with a degree of proficiency sufficient to satisfactorily complete the juror qualification forms;
(3) is unable to speak the English language;
(4) is incapable, by reason of mental or physical infirmity, to render satisfactory jury service; or
(5) has a charge pending against him/her for the commission of, or has been convicted in a State or Federal Court of record, of a crime punishable by imprisonment for more than one year and his/her civil rights have not been restored.
(Exh. A at 6). The Plan also provides for three exemptions from jury service that may be obtained on individual request. (Exh. A at 6–7).

6. The jury clerk also electronically transferred this data to the GSA in New York. (Testimony of Clerk Rowe).

7. The processes for selecting a panel for a grand jury selection and a jury selection is the same, except that, in the case of a grand jury, the jury clerk excludes all those who have been summoned for jury service at least once since the creation of the existing qualified wheel. (Testimony of Clerk Rowe).

8. Clerk Rowe testified, for example, that many individuals do not read the instructions when completing the questionnaire and do not discover that they are excused from jury service until they are summoned to court for a particular venire. Mr. Rowe also testified, for example, that the jury clerk, when selecting a particular venire, suppressed the names of various categories of individuals, such as those who were recently summoned for another venire or who were known to be unavailable at the time of the drawing for that particular venire. Again, all of this information was maintained simultaneously on the database at the GSA in New York. Thus, the pool of names for potential jurors did not vary between New York and New Haven. *Compare United States v. Jackman*, 46 F.3d 1240, 1243 (2d Cir.1995) (identifying differences between qualified wheel, "jury clerk's pool" and "picking list").

or static, but, rather, fluctuates with a gradual qualification process.

## II. *The New Haven Qualified Wheel*

Between October 1, 1993, the time the amended Plan took effect, and May 5, 1995, the GSA mailed approximately 11,000 questionnaires to individuals in the New Haven master wheel. Approximately 13.7%, or 1516 questionnaires, were returned to the Clerk's Office marked as "undeliverable." [9]

From these 11,000 questionnaires, the court has qualified 4,722 individuals for jury service. Of the 4,722 individuals who have qualified for jury service, 5.6% are African American and 2.3% are Hispanic. (*See* Def. Exh. E) (analysis of racial composition of qualified wheel (and subtract "unknowns" from total)).[10]

On April 12, 1995, the date that Mr. Rioux's venire was randomly selected from the qualified wheel, there were 1,554 individuals qualified for jury service and available for selection of Mr. Rioux's venire. (Def. Exh. X (analysis of racial composition of qualified wheel on April 12, 1995)). Of these 1,554 individuals, 4.35% were African American and 1.625% were Hispanic. (*See* Def. Exh. X (and subtract "unknowns" from total)).

The 1990 United States Census data indicates that 7.08% of the voting-age population in the New Haven division is African American and 4.24% is Hispanic. (*See* Def. Exh. M at n. 2 and attachment).

## III. *Oversight*

After adopting the Plan in 1992, the district judges appointed a magistrate judge and an oversight committee to monitor the jury selection process in the district. The magistrate judge provided regular and detailed reports to then-Chief Judge Cabranes. (*See* Def. Exhs. K–R (Magistrate's Reports)).

In her November 1993 and April 1994 reports, Magistrate Judge Margolis addressed the representation of minorities, particularly Hispanics, in the qualified wheel and identified potential causes of, and remedies for, any unacceptable underrepresentation. (Def.Exhs. M, P). More specifically, she noted that the district "continue[s] to lose significant numbers of Hispanics through disqualification, which includes lack of citizenship, lack of fluency in English,[11] and illiteracy." (Exh. P at 7). In the New Haven division, for example, the disqualification rate for Hispanics was 30.1%, versus 7.6% for whites and 6.3% for African–Americans. (Exh. P at 8).

The magistrate judge also made recommendations to remedy any perceived underrepresentation:

The Second Jury Plan could be amended to include the following additional efforts: (1) increasing the number of questionnaires sent from [the three municipalities in the New Haven division with more than 20% minority population], if such city is substantially underrepresented; (2) sending a third notice, perhaps from a judicial officer, if a potential juror fails to respond to the first two notices; (3) increasing the number of questionnaires if the non-responsive rate exceeds a designated per-

---

**9.** Defense counsel reviewed the questionnaires and stated that he discovered 1,048 undelivered envelopes and 417 completed certified mail/return receipt postcards. Of the 1,048, 631, or 60.2%, reflected addresses in municipalities with an African–American/Hispanic population exceeding 10%. Two hundred and sixty-five, or 25.3%, reflected addresses in New Haven, which has an African–American/Hispanic population of 41%. (Def. Sup. Mem. in Support of Motion to Dismiss at 16 n. 11 (hereinafter "Def. Mem. III.")).

**10.** In calculating the racial composition of the qualified wheel, the court omits those individuals who did not indicate race on the completed questionnaire. The court includes as non-His-

panic whites those individuals who indicated that they were white in response to question 10 but did not indicate whether they were Hispanic or not Hispanic on question 11. *See United States v. Osorio*, 801 F.Supp. 966, 971–72 (D.Conn. 1992) (following identical procedure); *see also United States v. Biaggi*, 680 F.Supp. 641, 646 (S.D.N.Y.1988), *aff'd*, 909 F.2d 662 (2d Cir.1990) (excluding those questionnaires that "either contained no answer to questions of race and ethnicity or were lost. . . ."); (*see also* Def. Exh. B (Jury Questionnaire)).

**11.** The defendant also suggests, without any supporting data, that the high disqualification rate is due to an "over-liberal use of the language disqualification factor." (Def. Mem. I at 23).

centage; (4) increasing the number of questionnaires if the undeliverable rate exceeds a designated percentage; and (5) increasing the number of questionnaires if the total number of disqualified, exempt, and excused jurors exceeds a designated percentage.

(Exh. M at 11–12). However, the magistrate judge was suddenly taken ill shortly after her last report in June of 1994. She did not return from a leave of absence until June of 1995.

## DISCUSSION

### I. *The Sixth Amendment*

▮ The Sixth Amendment guarantees the accused in a criminal prosecution a trial by an impartial jury. The right to an impartial jury "comprehends 'a fair possibility for obtaining a jury constituting a representative cross-section of the community.'" *Taylor v. Louisiana,* 419 U.S. 522, 528, 95 S.Ct. 692, 697, 42 L.Ed.2d 690 (1975) (quoting *Peters v. Kiff,* 407 U.S. 493, 500, 92 S.Ct. 2163, 2167, 33 L.Ed.2d 83 (1972)).

However, the Sixth Amendment does not require that petit juries actually mirror the community population. *Taylor,* 419 U.S. at 538, 95 S.Ct. at 701–02. Rather, it requires only that "Jury wheels, pools of names, panels or venires from which juries are drawn ... not *systematically* exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Id.* (emphasis added). Thus, in assessing a Sixth Amendment claim, the proper focus of inquiry is the system of jury selection. *Jackman,* 46 F.3d at 1246; *Ramseur v. Beyer,* 983 F.2d 1215, 1234 (3d Cir.1992) (en banc), *cert. denied,* 508 U.S. 947, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993); *United States v. Test,* 550 F.2d 577, 589 (10th Cir.1976); *Osorio,* 801 F.Supp. at 975.

▮ The Supreme Court has established a three-pronged test to determine whether there is a prima facie violation of the Sixth Amendment. *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668–69, 58 L.Ed.2d 579 (1979). Under the *Duren* test, the defendant must establish:

(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process.

*Id.* The government may rebut a prima facie case by "showing attainment of a fair cross section to be incompatible with a significant state interest." *Jackman,* 46 F.3d at 1251 (quoting *Duren,* 439 U.S. at 368, 99 S.Ct. at 671). Thus, with proper caution, the government may establish reasonable qualifications for jurors and exemptions from jury service, although such qualifications and exemptions inevitably detract from representativeness. *Duren,* 439 U.S. at 370, 99 S.Ct. at 671–72; *Taylor,* 419 U.S. at 534–35, 95 S.Ct. at 699–700.

### A. *Distinctive Groups*

The government concedes that African–Americans and Hispanics are "distinctive" groups in this community. *See United States v. Jenkins,* 496 F.2d 57, 65 (2d Cir. 1974) (finding that African–Americans are a distinctive group within the New Haven division); *see also Osorio,* 801 F.Supp. at 977 (finding that African–Americans and Hispanics are distinctive groups within the Hartford division of the District of Connecticut).

### B. *A Fair Cross–Section*

In assessing the representativeness of a jury selection system, the court must evaluate the racial composition of the relevant jury pool in comparison to the racial composition of the community population. *Jackman,* 46 F.3d at 1246 (citations omitted); *United States v. Maldonado–Rivera,* 922 F.2d 934 (2d Cir.1990), *cert. denied,* 501 U.S. 1211, 111 S.Ct. 2811, 115 L.Ed.2d 984 (1991); *United States v. LaChance,* 788 F.2d 856, 868 (2d Cir.1986), *cert. denied,* 479 U.S. 883, 107 S.Ct. 271, 93 L.Ed.2d 248 (1986); *Osorio,* 801 F.Supp. at 977 (citations omitted). The task, therefore, is to define the parameters of the "community population," the "relevant jury pool," and the method of "comparison."

### 1. *The Community Population*

The community population, for purposes of assessing representativeness, is the population eligible for jury service in the community. *United States v. Rodriguez*, 776 F.2d 1509, 1511 (11th Cir.1985); *Test*, 550 F.2d at 582; *see Taylor*, 419 U.S. at 524, 95 S.Ct. at 694–95 (focusing on population eligible for jury service). Because such data regarding the general population is rarely available, courts and litigants generally defer to the voting-age population. More specifically, the census data provides the most useful information. *LaChance*, 788 F.2d at 865; *Osorio*, 801 F.Supp. at 977 (citations omitted).

### 2. *The Relevant Jury Pool*

Neither the Supreme Court nor the Second Circuit has defined the "relevant jury pool" with any specificity. In other words, neither has set forth the specific evidence which defendants must produce, and courts must examine, in assessing a Sixth Amendment claim, with respect to the particular group that constitutes the pool or the particular timeframe over which that group should be examined.

Moreover, a review of Sixth Amendment cases does not reveal any uniform analysis. Some cases examine the master wheel; some examine the qualified wheel over time; some examine the venires appearing around the time of the defendant's trial; still others examine a combination of such evidence. *See United States v. Biaggi*, 909 F.2d 662, 677 (2d Cir.1990) (examining master wheel); *LaChance*, 788 F.2d at 865–69 (suggesting court should examine qualified wheel over the year in which defendant was indicted (challenge to grand jury) or convicted (challenge to petit jury)); *Jenkins*, 496 F.2d at 64 (examining "jury pools" from 1969 to 1973); *Ramseur*, 983 F.2d at 1234–35 (identifying length of time as factor in determining representativeness); *Singleton v. Lockhart*, 871 F.2d 1395, 1398 (8th Cir.1988) (requiring defendant to prove underrepresentation "on his venire and in general on other venires . . . near the time of his trial."); *Duren*, 439 U.S. at 360, 99 S.Ct. at 666–67 (examining combination of evidence over different periods of time). Although some courts might examine a particular group, such as the qualified wheel, on the date of the selection of the defendant's venire, research discloses no case that explicitly or consciously identifies that as the relevant pool. *But see Osorio*, 801 F.Supp. at 971 (stating that "there are a total of 1779 juror questionnaires in the Hartford Qualified Wheel.").

The issue is complicated by continuous technological advancements in the jury selection system. For example, while jury challenges only recently required manual and time-consuming analysis of records in this district, a new computer system now generates detailed computer analyses of all venires for the first time. (Def. Exh. M at 5). Moreover, the new system can provide not only an analysis of the racial composition of the qualified wheel over the life of the wheel, but also an analysis of the racial composition of all potential jurors available for summoning on a particular date. (*See* Def. Exh. E) (computer analysis of qualified wheel since its inception; *compare* Def. Exh. X (computer analysis of qualified wheel as it existed on April 12, 1995)).

Nevertheless, a review of some leading Sixth Amendment cases provides important guidance for the issues arising in this case. More specifically, although there are no precise standards governing the evidence required for a successful challenge, the defendant must present, and the court must examine, statistical evidence in the context of the systematic defect identified by the defendant.

In *Duren*, for example, the defendant claimed that an automatic exemption from jury service for all women who requested it systematically excluded women from jury service. 439 U.S. at 360, 99 S.Ct. at 666–67. The Court examined the effect of the identified systematic defect, the exemption, on the jury selection process. More specifically, the Court examined statistical evidence reflecting the effect of the exemption at the various stages of the selection process—the construction of the master wheel, the construction of the qualified wheel, and the venire stage. *Id.* at 366–67, 99 S.Ct. at 669–70.

Because the selection system only granted the exemption upon request, it did not, and could not, affect the construction of the master wheel—"the questionnaire canvass of persons randomly selected from the relevant voter registration list." *Duren*, 439 U.S. at 366, 99 S.Ct. at 669. Because women answering the questionnaire were able to claim the exemption and thereby avoid a summons, the effect of the exemption could be measured at the next stage—the construction of the qualified wheel, or, "the jury wheel from which persons are randomly summoned for service." *Id.* Because women were given another opportunity to claim the exemption after receiving a summons, and were presumed to have claimed the exemption if they did not respond to the summons, the effect of the exemption could be measured at the venire stage of the selection process as well. *Id.* at 366–67, 99 S.Ct. at 669–70.

Significantly, in assessing the representation of women at the qualified wheel[12] and venire stages, the Court did not restrict its analysis to the petitioner's venire or to the pool of jurors eligible for the petitioner's venire (i.e. the qualified wheel on the date of the drawing of the petitioner's venire). Rather, the Court examined statistical evidence of the representation of women on the qualified wheel and in venires over time. *Duren*, 439 U.S. at 362–63, 366–67, 99 S.Ct. at 667–68, 669–70. Specifically, the Court examined the composition of those summoned over an eight-month period, weekly venires during the "period in which petition-

er's jury was chosen," weekly venires during the month in which petitioner's trial began, petitioner's venire and petitioner's petit jury.[13] *Id.* Thus, because substantial underrepresentation occurred over a significant period of time, or, "consistently," in those jury pools affected by the exemption, the Court concluded that the underrepresentation occurred as a result of the identified systematic defect. *Id.* at 367, 99 S.Ct. at 670 ("The resulting and consistent exclusion of women from the jury wheel and at the venire stage was quite obviously due to the system by which juries are selected.").

Thus, with respect to the "relevant jury pool," the teaching of *Duren* is two-fold. First, the defendant must present, and the court must examine, statistical evidence in the context of the systematic defect identified by the defendant. The identified systematic defect defines both the particular pool and the timeframe over which that pool is examined. In most cases, "systematic" contemplates exclusion over time.[14] Second, the second and third prongs of the *Duren* test, unfair representation and systematic exclusion, are intertwined inextricably. In other words, although the two prongs are separate inquiries, the evidence relating to systematic exclusion is relevant to unfair representation, and vice versa.[15]

Case law in the Second Circuit is in accord with this interpretation of *Duren*. In *Biaggi*, for example, the defendant claimed that reli-

---

12. Although the court actually examined the composition of those summoned over time, rather than the composition of the qualified wheel over time, it did so in order to examine representation on the qualified wheel over time. *See Duren*, 439 U.S. at 367, 99 S.Ct. at 669–70. ("The first sign of a systematic discrepancy is at the next stage—the construction of the jury wheel from which persons are randomly summoned for service. Less than 30% of those summoned were female, demonstrating that a substantially larger number of women answering the questionnaire claimed either ineligibility or exemption from jury service."). Presumably, this evidence was more readily available to the petitioner and the Court.

13. The Court accepted and employed the statistical evidence presented by the defendant. *Duren*, 439 U.S. at 362–63, 366–67, 99 S.Ct. at 667–68, 669–70.

14. The court does not mean to suggest that an isolated occurrence could not constitute systematic exclusion.

15. *See also Ramseur*, 983 F.2d at 1231 n. 3 (discussing second and third prong of equal protection challenge to jury pool):

> To the extent that each prong can be characterized as an independent inquiry, examination of evidence that could satisfy both prongs need not fully collapse those inquiries. Moreover, it is logical to view the presence of a ... disparity as establishing 'underrepresentation,' while the disparity's severity, longevity, underlying causes, and documentation would establish whether it was 'substantial.'

> *Id.*

ance on voter registration lists systematically excluded African–Americans and Hispanics from jury service. 909 F.2d at 677. There, the court identified the district's master wheel as its relevant jury pool. *Id.* Moreover, in determining whether disparities between the master wheel and the community population were substantial or unfair under *Duren's* second prong, the court noted that it "would find the Sixth Amendment issue extremely close if the underrepresentation had resulted from any circumstance less benign than use of voter registration lists." *Id.* at 678.

Thus, as in *Duren,* the court in *Biaggi* examined the pool of jurors affected by the use of voter registration lists, or, in other words, the stage of the selection process affected by the identified systematic defect. Because the use of voter registration lists did not impact directly on the subsequent stages of the jury selection process,[16] the court necessarily limited its analysis to the master wheel, which does not fluctuate over time. In *Biaggi,* then, the defendant's claim defined both the particular pool and the timeframe over which that pool was examined. Moreover, in allowing the "benign" nature of the use of voter registration lists to influence the court's determination of unfair representation, the court intertwined the second and third prongs of the *Duren* test.

In *Jackman,* the Second Circuit's most recent Sixth Amendment case, the defendant claimed that the procedure adopted to remedy the jury selection process declared unconstitutional in *Osorio* did not remedy the

systematic defect, but, rather, continued to exclude minorities from jury service. 46 F.3d 1240. In *Osorio,* the district court had held that an inadvertent computer defect, excluding all residents of Hartford and New Britain from petit jury venires, systematically excluded minorities from jury service in violation of the Sixth Amendment.[17] 801 F.Supp. at 980. In the aftermath of *Osorio,* the Hartford division constructed a new qualified wheel including residents of Hartford and New Britain. *Jackman,* 46 F.3d at 1243–44.

However, while the division abandoned the old qualified wheel, the jury clerk responsible for summoning jurors did not abandon the pool of names in her computer, all of which were taken from the old qualified wheel.[18] Rather, she created a "picking list" from the names on her computer and supplemented that list, as needed, with additional names from the new qualified wheel. *Jackman,* 46 F.3d at 1244. For example, the clerk generated a "picking list" of 78 names for Jackman's jury selection and supplemented that list with 22 names from the new qualified wheel in order to produce a 100–person venire. *Id.* This action formed the basis of Jackman's Sixth Amendment challenge.

In assessing Jackman's claim, the court, admittedly, did not rely on any particular pool of jurors. Rather, the court noted that the clerk's pool provided 78 venirepersons and the new qualified wheel provided 22 venirepersons. It also examined a functional wheel constructed and urged by amici curiae.[19] *Jackman,* 46 F.3d at 1246. Ultimately,

---

**16.** *Contrast Duren* at 366–67, 99 S.Ct. at 669–70 (finding that exemption initially affects construction of qualified wheel and subsequently affects venires because of the second opportunity to exempt women at the summons stage).

**17.** At the time of *Osorio,* Hartford and New Britain accounted for 62.93% of the voting-age African–American population and 68.09% of the voting-age Hispanic population in the Hartford division. 801 F.Supp. at 972.

**18.** Under the new computer system, the list in the jury clerk's computer does not differ from the qualified wheel. In other words, the GSA and the Clerk's Office simultaneously maintain identical information through electronic transfer of data. *See Facts* n. 6, *supra.*

**19.** The functional wheel reflected "the wheel that would be assembled by drawing names from the old Qualified Wheel and the new Qualified Wheel in the same proportion as those wheels served as the source for the 100 names on appellant's 'picking list.'" *Jackman,* 46 F.3d at 1246. Figures from this theoretical construct yielded slightly smaller disparities than occurred in *Osorio.* *Id.; compare Osorio,* 801 F.Supp. at 978 (demonstrating 3.26% disparity for African–Americans and 4.30% disparity for Hispanics). According to the dissent, the functional wheel in *Jackman* reflected a 2.5% disparity for African–Americans and a 3.4% disparity for Hispanics (with an absolute impact of two African–Americans and two Hispanics on an average venire of 60). 46 F.3d at 1252 (Walker, J. dissenting).

however, the court concluded that underrepresentation occurred without identifying any "relevant pool" or method of "comparison." *See id.* at 1246–48 (discussing underrepresentation); *see also* Discussion IB3 (Method of Comparison), *infra.*

Yet, the court did not rely on any particular pool of potential jurors specifically because there was no uniform pool or preestablished source list available to determine the "overall representativeness of the system." *Jackman,* 46 F.3d at 1246. Moreover, the court did not rely on any particular method of comparison because there was "no broad source of names ... to support the argument that the representations in the venire selected in any one case were only slight departures from the representations in *average* venires that would *regularly* be selected." *Id.* at 1248 (emphasis added). In *Jackman* terms, then, what must be measured is the "representativeness of the system." *Id.* at 1246.

Although the import of the extensive dicta in *Jackman* is not yet clear, the crux of the *Jackman* decision is clear. By using the old, unrepresentative list as the primary source of names, with minimal supplementation from the new qualified wheel, the interim procedure adopted by the jury clerk preserved the unrepresentative system exposed in *Osorio.* *Jackman,* 46 F.3d at 1245.

> Since the new Qualified Wheel was presumably representative and the old Qualified Wheel was definitely not, any random selection of names derived from both the old wheel and the new wheel, without some careful adjustment, would inevitably produce a 'picking list' that permitted the underrepresentational effect of the old list to continue to taint the 'picking list.' ...
> [B]y making minimal use of the new list,

the clerk assured that the underrepresentativeness of the old list would significantly taint each 'picking list.'

*Id.* In other words, the "facial inadequacy" of this procedure was "sufficient to sustain [Jackman's] claim." *Id.*

In short, with respect to the "relevant jury pool," *Jackman* is in accord with *Duren.* *Duren* teaches that the court must assess representativeness in the context of the systematic defect identified by the defendant. Thus, in *Jackman,* the court had to determine how the interim procedure employed by the jury clerk affected the representativeness of the Hartford division's jury selection system. However, because the clerk did not utilize any uniform pool of names, or, in other words, because the court did not have data available to assess the overall representativeness of the system, it relied on the "facial inadequacy" of the procedure in finding a Sixth Amendment violation.[20] *Jackman,* 46 F.3d at 1245.

■ In summary, the teaching of the Second Circuit and the Supreme Court, with respect to the relevant jury pool, is two-fold. First, the defendant's claim defines both the particular pool to be examined and the general timeframe over which that pool should be examined. Second, because the claim must expose a systematic defect, the defendant's evidence must demonstrate that the overall system is unrepresentative. In most cases, courts and litigants must examine representativeness over time. In short, the unfair representation and systematic exclusion prongs of the *Duren* test are intertwined inextricably.

### 3. The Method of Comparison

In evaluating the racial composition of the relevant jury pool in comparison to the racial

**20.** Although the court did address each of the prongs of the *Duren* test, the discussion of underrepresentation, essentially, is dicta. *See Jackman,* 46 F.3d at 1245 ("The facial inadequacy of the interim procedure adopted in the Hartford Division seems sufficient to sustain appellant's claim. But, since the District Judge has ruled that the procedure, as applied in appellant's case, yielded an adequate result, we proceed to analyze appellant's claim in terms of the specific result."). A careful reading of *Jackman* reveals that the court concluded that underrepresenta-

tion occurred without identifying underrepresentation in any particular jury pool and without applying any measure of underrepresentation. *Id.* at 1246–48; *see also id.* at 1248 ("For all of these reasons, we conclude that appellant has shown a significant level of underrepresentation of Blacks and Hispanics for purposes of the Sixth Amendment."). Thus, the court necessarily relied on the facial inadequacy of the procedure in finding a Sixth Amendment violation. *Id.* at 1245; *see also* Discussion IB3 ("Method of Comparison").

composition of the community population, the court must decide upon a method of "comparison," or, a measure of underrepresentation. Courts and scholars have advanced four different mathematical measures for determining underrepresentation. Note, *A Proposal for Measuring Underrepresentation in the Composition of the Jury Wheel*, Peter A. Detre, 103 Yale L.J. 1913, 1917 (1994) (hereinafter "Detre"). They are: "absolute disparity," "absolute impact," "comparative disparity," and "statistical decision theory." Detre, *supra* at 1917.

Absolute disparity is defined as the difference between a group's representation in the population and its representation in the relevant jury pool. Detre, *supra* at 1917. Thus, if a distinct group represents 10% of the eligible community population and 6% of the relevant jury pool, the absolute disparity is 4%. Detre, *supra* at 1917.

The absolute impact measure determines how many individuals from the distinctive group would have to be added to the typical venire in order to make the venire representative with respect to that group. *Jackman*, 46 F.3d at 1247 n. 4. In other terms, absolute impact is the average difference per venire due to the underrepresentation. Detre, *supra* at 1920.

The calculation of absolute impact involves two steps. First, the court must calculate the absolute disparity. Second, the court must multiply the absolute disparity by the size of a typical venire. *Jackman*, 46 F.3d at 1247 n. 4. For example, an absolute disparity of 1% as applied to a venire of 100 jurors would result in an absolute impact of 1 juror. Thus, a venire of 100 persons would have to include one more person from the distinct group in order to redress the group's underrepresentation. *United States v. Gerena*, 677 F.Supp. 1266, 1271 (D.Conn.1986), *aff'd. sub nom. United States v. Maldonado–Rivera*, 922 F.2d 934, 970 (2d Cir.1990), *cert. denied*, 501 U.S. 1233, 111 S.Ct. 2858, 115 L.Ed.2d 1025 (1991).

Comparative disparity "measures the diminished likelihood that members of an underrepresented group, when compared to the population as a whole, will be called for jury service." *Ramseur*, 983 F.2d at 1231–32.

Comparative disparity is calculated by dividing the absolute disparity by the group's representation in the eligible community and then multiplying by 100%. Detre, *supra* at 1917–18. For example, the comparative disparity of a group comprising 10% of the community and 6% of the relevant jury pool is 40% ((4%/10%) × 100%). Detre, *supra* at 1918.

Statistical decision theory measures the likelihood that a deviant result occurred by chance. *Ramseur*, 983 F.2d at 1232 n. 17. For the reasons discussed *infra*, the court does not set forth the lengthy and complicated formula required for statistical decision theory. *See* Detre, *supra* at 1938 n. 26 (setting out formula).

The primary criticism of the absolute disparity and absolute impact measures is that they understate underrepresentation in communities where the underrepresented group is a small percentage of the community population. Detre, *supra* at 1921 (citing *Moultrie v. Martin*, 690 F.2d 1078, 1082 (4th Cir.1982); *Foster v. Sparks*, 506 F.2d 805, 835 (5th Cir.1975)); *see also Jackman*, 46 F.3d at 1246–47. Statistics demonstrate that use of these tests in certain communities can lead to substantial exclusion, if not total exclusion, of the underrepresented group. *Jackman*, 46 F.3d at 1247, 1247 n. 5.

There are two key criticisms of the comparative disparity measure. First, comparative disparity can overstate underrepresentation in communities where the underrepresented group is a small percentage of the community population. *United States v. Hafen*, 726 F.2d 21, 24 (1st Cir.), *cert. denied*, 466 U.S. 962, 104 S.Ct. 2179, 80 L.Ed.2d 561 (1984) ("[T]he smaller the group is, the more the comparative disparity figure distorts the proportional representation."); *see also Jackman*, 46 F.3d at 1253–54 (Walker, J. dissenting) (arguing that absolute disparity does not overstate the actual effect on the venire of underrepresentation of small groups). For example, "in the extreme case of only one member of a minority group in a community, if that person is not included in the jury wheel, the comparative disparity be-

tween the incidence of that minority on the jury wheel and in the population is 100%." Detre, *supra* at 1922.

Second, other courts reason that because comparative disparity measures an underrepresented group's chances of being called for jury service, it is not relevant to a Sixth Amendment challenge. In other words, the focus of the Sixth Amendment is the effect of the jury selection system on a *defendant's* right to a jury selected at random from a fair cross-section of the community. *Jenkins,* 496 F.2d at 64–66.

A similar criticism can be directed at statistical decision theory. In other words, because statistical decision theory measures the likelihood that a deviant result occurred by chance, it is uniquely suited to the equal protection context, where discriminatory intent is of primary importance. As discriminatory intent is not at issue under the Sixth Amendment, there is no rationale for statistical decision theory in this context. Detre, *supra* at 1923–24.

The Supreme Court has not adopted any mathematical test for determining underrepresentation. Although the "language of the test in *Duren*—that the representation of the group 'is not fair and reasonable in relation to the number of such persons in the community'—could suggest either comparative disparity or absolute disparity[,] ... the Court seems to have considered only absolute disparity" in *Duren.* Detre, *supra* at 1919 (quoting *Duren,* 439 U.S. at 364, 99 S.Ct. at 668).

The majority of lower courts have adopted absolute disparity or absolute impact measurements of underrepresentation. Detre, *supra* at 1919, 1938 n. 33 (citing *United States v. Rodriguez,* 776 F.2d 1509, 1511 (11th Cir.1985); *United States v. Tuttle,* 729 F.2d 1325, 1327 (11th Cir.1984); *Hafen,* 726 F.2d at 23–24; *United States v. Clifford,* 640 F.2d 150, 155 (8th Cir.1981); *United States v. Goff,* 509 F.2d 825, 826 (5th Cir.), *cert. denied,* 423 U.S. 857, 96 S.Ct. 109, 46 L.Ed.2d 83 (1975); *United States v. Armsbury,* 408 F.Supp. 1130, 1136 (D.Or. 1976) (parentheticals omitted)); *see also Jenkins,* 496 F.2d at 66 (adopting absolute impact measure for Second Circuit). Al-

though at least two courts have employed the comparative disparity measure in conjunction with other measures, *Ramseur,* 983 F.2d at 1231; *Foster v. Sparks,* 506 F.2d at 835, research discloses no case that adopts comparative disparity as the measure of underrepresentation. Although one court has employed statistical decision theory in conjunction with other measures, *Ramseur,* 983 F.2d at 1231, research discloses no case that adopts statistical decision theory as the measure of underrepresentation.

In those cases employing an absolute numbers approach, courts have approved disparities between 2% and 11.5%. *Ramseur,* 983 F.2d at 1232 (citing *Hafen,* 726 F.2d at 23 (2.02%); *Bryant v. Wainwright,* 686 F.2d 1373, 1377–78 (11th Cir.1982), *cert. denied,* 461 U.S. 932, 103 S.Ct. 2096, 77 L.Ed.2d 305 (1983) (7.4%); *United States v. Hawkins,* 661 F.2d 436, 442 (5th Cir.1981), *cert. denied,* 456 U.S. 991, 102 S.Ct. 2274, 73 L.Ed.2d 1287 (1982) (5.45%); *Clifford,* 640 F.2d at 155 (7.2%); *United States ex rel. Barksdale v. Blackburn,* 639 F.2d 1115, 1126–27 (5th Cir. 1981), *cert. denied,* 454 U.S. 1056, 102 S.Ct. 603, 70 L.Ed.2d 593 (1981) (11.5%); *United States v. Potter,* 552 F.2d 901, 906 (9th Cir. 1977) (7.2%); *Thompson v. Sheppard,* 490 F.2d 830, 832–33 (5th Cir.1974); *cert. denied,* 420 U.S. 984, 95 S.Ct. 1415, 43 L.Ed.2d 666 (1975) (11.0%); *United States v. Musto,* 540 F.Supp. 346, 356 (D.N.J.1982), *aff'd sub nom., United States v. Aimone,* 715 F.2d 822 (3d Cir.1983), *cert. denied,* 468 U.S. 1217, 104 S.Ct. 3585, 82 L.Ed.2d 883 (1984) (5.4%)). However, some courts have found disparities of between 10% and 16% sufficient to establish substantial underrepresentation. *Id.* at 1231 (citing *Jones v. Georgia,* 389 U.S. 24, 25, 88 S.Ct. 4, 5, 19 L.Ed.2d 25 (1967) (15.7%); *Hernandez v. Texas,* 347 U.S. 475, 480–81, 74 S.Ct. 667, 671–72, 98 L.Ed. 866 (1954) (14%); *Stephens v. Cox,* 449 F.2d 657, 659–60 (4th Cir.1971 (15%)).

The law of this circuit was settled prior to *Jackman.* In *Jenkins,* the Second Circuit rejected comparative disparity and adopted absolute impact as the determinant of underrepresentation. 496 F.2d at 66. The court reasoned that comparative disparity is not relevant to a fair cross-section challenge be-

cause the proper focus of inquiry, under the Sixth Amendment, is not a particular group's chances of being called for jury service but a defendant's right to a jury selected at random from a fair cross section of the community. *Id.* at 65. Moreover, the court reasoned, because there is no constitutional or statutory guarantee of precise proportional representation, the absence of one or two members of a distinct group on an average panel of 60 could hardly be said to deprive a defendant of a fair cross-section. *Id.*

Since *Jenkins,* courts in this circuit have criticized the absolute numbers approach. In *Alston v. Manson,* 791 F.2d 255 (2d Cir. 1986), for example, the court stated in dicta [21] that "the absolute disparity approach employed in *Jenkins* may be outmoded and should be discarded." 791 F.2d at 259. In *Biaggi,* the court noted the criticism in *Alston* and explained the weakness of an absolute impact measure:

> The risk of using this approach is that it may too readily tolerate a selection system in which the seemingly innocuous absence of small numbers of a minority from an average array creates an unacceptable probability that the minority members of the jury ultimately selected will be markedly deficient in number and sometimes totally missing.

*Biaggi,* 909 F.2d at 678. Perhaps more importantly, the court noted that the facts of *Biaggi* [22] "press[ed] the *Jenkins* 'absolute numbers' approach to its limit," and warned that it "would find the Sixth Amendment issue extremely close if the underrepresentations had resulted from any circumstance less benign than use of voter registration lists." *Id.* Yet, despite these criticisms, the Second Circuit has continued to reaffirm ab-

solute impact as the governing measure of underrepresentation. *Biaggi,* 909 F.2d at 678; *Maldonado–Rivera,* 922 F.2d at 970; *United States v. Rosario,* 820 F.2d 584, 584 n. 1 (2d Cir.1987).

In *Jackman,* however, the Second Circuit declined to apply the absolute measure impact to a functional wheel proposed by amici curiae.[23] 46 F.3d at 1246–47. The court enumerated three reasons for rejecting absolute impact in that case. *Id.* at 1246–48.

First, as recognized in *Biaggi,* the absolute impact measure can lead to questionable or unfair results when applied to communities where minorities represent only a small percentage of the population. *Jackman,* 46 F.3d at 1247. The smaller the group is, the more acute the problem becomes. *See id.* at 1247, 1247 n. 5 (comparing Southern District of New York and Hartford).

Second, the underrepresentation in *Biaggi,* although "at the very edge of acceptability," resulted from the "benign" use of voter registration lists. *Jackman,* 46 F.3d at 1247, 1247 n. 5. The jury clerk's decision to rely on names from the pre-*Osorio* wheel, as the primary source of venirepersons, the court reasoned, was "far less benign" than what occurred in *Biaggi* or *Osorio. Id.* at 1247.

Third, because of the procedure employed by the jury clerk, there was no uniform source of names available to assess the overall representativeness of the system. *Jackman,* 46 F.3d at 1246, 1248. Although the court knew that Jackman's venire contained no African–Americans and only one Hispanic, it concluded that "the absolute numbers approach, even if otherwise applicable, cannot save underrepresentation to that degree." *Id.* at 1248.

---

21. *Alston* involved an equal protection challenge to a jury selection process. The court adopted statistical decision theory as the measure of underrepresentation in that context and proposed its adoption in the fair cross-section context as well. *Alston,* 791 F.2d at 259. As discussed *supra,* "the lack of any clear argument for the adoption of statistical decision theory [in fair cross-section cases] is doubtless responsible for the fact that, despite the dicta in *Alston,* the Second Circuit has since reaffirmed the use of the absolute impact standard." Detre, *supra,* at 1924 (citations omitted).

22. *Biaggi* involved a disparity of 3.6% for African–Americans and 4.7% for Hispanics. 909 F.2d at 677. In absolute impact terms, these disparities represent two African–Americans and two to three Hispanics on an average venire in the Southern District of New York. *Id.* at 677–78. In comparative disparity terms, these disparities represent a disparity of 18.09% for African–Americans and 29.93% for Hispanics.

23. *See* n. 19, *supra* (explaining functional wheel).

More importantly, though, the court did not adopt, or even apply, a substitute measure of underrepresentation. In a footnote, it demonstrated through statistics that Jackman's "opportunity for a representative jury venire was dramatically worse than the defendant's opportunity for a representative jury venire in *Biaggi*." *Jackman*, 46 F.3d at 1247 n. 5. However, these statistics, while apparently a variant of statistical decision theory, *id.* at 1254 (Walker J., dissenting), do not set forth an alternative measure, but merely support the majority's argument that the weakness of the absolute impact measure is particularly acute in communities such as Hartford. *Id.* at 1247 (ending discussion of weakness with footnote 5). Moreover, the statistics are employed in a vacuum—the majority "fails to provide any standard by which we can judge whether the probabilities they generate are constitutionally meaningful." *Id.* at 1254 (Walker, J., dissenting).

■ In short, the majority calls the vitality of the absolute numbers approach into serious question without providing any guidance to the lower courts as to an appropriate substitute measure of underrepresentation. However, because the majority identified the unique circumstances of *Jackman* as the primary motivation for rejecting the absolute numbers approach, 46 F.3d at 1247–48, this court does not interpret *Jackman* to change the law to any significant extent. Thus, in the absence of less than "benign" circumstances, or a procedure which precludes effective review of representation, the absolute impact measure continues to govern a fair cross-section challenge.

### C. *Systematic Exclusion*

To succeed with a Sixth Amendment challenge, a defendant must establish that unfair representation of a distinct group is "due to systematic exclusion of the group in the jury selection process." *Duren*, 439 U.S. at 364, 99 S.Ct. at 668. In *Duren*, the Supreme Court defined systematic exclusion as exclusion "inherent in the particular jury selection process utilized." *Id.* at 366, 99 S.Ct. at 669. In other words, "if the effect of implementing the [jury selection] plan leads to systematic (i.e., not occasional) exclusion," the third prong of the *Duren* test is satisfied. *Osorio*, 801 F.Supp. at 979.

■ However, a showing of statistical disparity alone is not sufficient to sustain a Sixth Amendment challenge. *United States v. Pion*, 25 F.3d 18, 23 (1st Cir.1994); *United States v. Garcia*, 991 F.2d 489, 492 (8th Cir. 1993); *Barber v. Ponte*, 772 F.2d 982, 997 (1st Cir.1985) (en banc), *cert. denied*, 475 U.S. 1050, 106 S.Ct. 1272, 89 L.Ed.2d 580 (1986); *Test*, 550 F.2d at 586–87 (10th Cir. 1976); *Anderson v. Casscles*, 531 F.2d 682, 685 (2d Cir.1976); *United States v. Gruberg*, 493 F.Supp. 234, 246–47 (S.D.N.Y.1979). "The existence of systematic underrepresentation turns on the process of selecting venires, not on the outcome of that process in a particular case." *Jackman*, 46 F.3d at 1248. Thus, the defendant must identify a specific systematic defect or "operational deficiency" which "would account for the alleged underrepresentation." *Pion*, 25 F.3d at 23.

In *Duren*, for example, the court identified the automatic exemption of women from jury service as a systematic defect creating substantial underrepresentation of women on jury venires. *Duren*, 439 U.S. at 366–67, 99 S.Ct. at 669–70. In *Osorio*, the court identified the computer defect excluding residents of Hartford and New Britain from the jury selection process as a systematic defect creating substantial underrepresentation of African–Americans and Hispanics on the qualified wheel. *Osorio*, 801 F.Supp. at 979–80. In *Jackman*, the court identified the "clerk's decision to select most potential jurors from the pre-*Osorio* jury clerk's pool" as a systematic defect creating substantial underrepresentation of African–Americans and Hispanics in jury venires. *Jackman*, 46 F.3d at 1248. In short, the underrepresentation must occur as a result of a particular procedure—it must be "accomplished by action within the court." *Id.* at 1245.

■ Discrepancies resulting from private sector influences rather than affirmative governmental action do not reflect the constitutional infirmities contemplated by the systematic exclusion prong of *Duren*. *United States v. Cecil*, 836 F.2d 1431, 1446–47 (4th Cir.1988); *Barber*, 772 F.2d at 997; *Test*, 550

F.2d at 586–87. Disparities between the composition of jury pools and the community population "can frequently be attributed to personal predilection ... as opposed to state or locally imposed impediments. And courts have uniformly held that such predilections cannot form the basis of a cognizable class and evoke judicial sanctions against the judicial system." *Cecil,* 836 F.2d at 1447. In other words, demographic trends, whether the result of personal predilection or wealth imbalances, preclude achievement of a true cross-section. Thus, "a process that comports with the need for efficient jury selection[,] even though it may not perfectly reflect population," may also comport with the Sixth Amendment. *Cecil,* 836 F.2d at 1448.

For example, despite allegations that minorities do not register to vote in the same percentages as whites, the circuits are in complete agreement that use of voter registration lists as the sole source of potential jurors comports with the Sixth Amendment. *Cecil,* 836 F.2d at 1447 (citing *United States v. Afflerbach,* 754 F.2d 866, 869–70 (4th Cir. 1985), *cert. denied,* 472 U.S. 1029, 105 S.Ct. 3506, 87 L.Ed.2d 636 (1985); *United States v. Warinner,* 607 F.2d 210, 214 (8th Cir.1979), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1313, 63 L.Ed.2d 760 (1980); *United States v. Brady,* 579 F.2d 1121, 1134 (9th Cir.1978), *cert. denied,* 439 U.S. 1074, 99 S.Ct. 849, 59 L.Ed.2d 41 (1979); *United States v. James,* 528 F.2d 999, 1022 (5th Cir.), *reh'g denied,* 532 F.2d 1054 (5th Cir.), *cert. denied,* 429 U.S. 959, 97 S.Ct. 382, 50 L.Ed.2d 326 (1976); *United States v. Lewis,* 472 F.2d 252, 256 (3d Cir. 1973); *Camp v. United States,* 413 F.2d 419, 421 (5th Cir.), *cert. denied,* 396 U.S. 968, 90 S.Ct. 451, 24 L.Ed.2d 434 (1969); *United States v. Caci,* 401 F.2d 664, 671 (2d Cir. 1968), *vacated and remanded on other grounds,* 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969); *United States v. Kelly,* 349 F.2d 720, 778 (2d Cir.1965), *cert. denied,* 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966)). These courts unanimously agree that in the absence of different registration standards, affirmative barriers to registration or deliberate interference with the registration process—in other words, in the absence of affirmative governmental action—private voting patterns that contribute to underrepresentation in jury pools do not constitute systematic exclusion.

### D. *The Defendant's Claims*

The defendant argues that the system of selecting grand jurors and petit jurors in the New Haven division of the District of Connecticut violates the Sixth Amendment, mandating dismissal of the indictment, or, alternatively, the jury.[24] More specifically, he argues that the New Haven division's failure to comply with the provisions of its Second Restated Plan and the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 *et seq.,* caused systematic exclusion of minorities in the jury selection process. (Def. Mem. in Sup.Mot. to Dismiss at 8, 16, 22–23 (hereinafter "Def. Mem. I")). He identifies four systematic defects which, he argues, create substantial underrepresentation of African-Americans and Hispanics in the New Haven qualified wheel. (Def. Mem. I at 16, 22–23).

First, Mr. Rioux argues that the New Haven division failed to "employ the mandated and necessary methods to serve the jury questionnaires on prospective jurors in the process of compiling the qualified pool" and thereby excluded minorities from the jury selection process. (Def. Mem. I at 16). He reasons that the use of outdated data, in conjunction with a significant decline in registered voters in urban areas such as New Haven, with a 41% population of African-Americans and Hispanics and a 22.8% decline in registered voters, produces a high undeliverable rate in minority-concentrated areas and negatively impacts on the representation of minorities in the qualified wheel. He further reasons that the failure to employ personal service by the United States Marshal, in light of such trends, systematically excludes minorities from jury service. (Def. Mem. I at 17–18, 22–23).

---

**24.** The court does not have an adequate record to assess the representativeness of the jury selection system for Mr. Rioux's grand jury. There is no evidence in the record reflecting the date on which Mr. Rioux's grand jury was convened or the particular pool from which his grand jury venire was selected. Accordingly, the court denies the motion as to dismissal of the indictment and considers Mr. Rioux's claims only as to dismissal of the petit jury.

Second, Mr. Rioux argues that the failure to maintain a list of persons that could not be located by mail or personal service, as required by the Plan, § X, produces systematic exclusion of minorities. (Def. Mem. I at 18–19, 22–23). He reasons that the failure to maintain such a list precludes effective detection and remedy of underrepresentation in the qualified wheel, and thereby preserves the existing underrepresentation.

Third, Mr. Rioux argues that the failure to adopt the recommendations of Magistrate Judge Margolis, who monitors the jury selection system, constitutes a systematic defect with a direct relationship to underrepresentation of minorities in the qualified wheel. (Def. Mem. I at 19–20, 22–23). He reasons from the magistrate judge's reports that the magistrate judge monitoring the jury selection system perceived and identified substantial underrepresentation of minorities, and suggested modifications which, if adopted, would have remedied this underrepresentation. He further reasons that inaction by the district court,[25] despite the magistrate judge's reports, constitutes systematic exclusion of minorities. (Def. Exh. I at 19–20, 22–23).

Finally, the defendant argues that the failure to provide adequate notice of the drawings for jury selection, as required by the Act and the Plan, see 28 U.S.C. § 1866; Second Restated Plan §§ X, XII, represents a systematic defect in the jury selection process. He reasons that public drawings provide an opportunity to identify and rectify any defects in the process at the earliest possible time. The failure to give notice of such drawing precludes detection and remedy of underrepresentation in the qualified wheel, thereby preserving existing underrepresentation. (Def. Mem. I at 20, 22–23).

In total, Mr. Rioux argues that these four systematic defects produced disparities between the qualified wheel and the community population of 4.02% for African–Americans and 3.58% for Hispanics. (Def. Reply Mem.

in Sup. Motion to Dismiss, Tables A–E (hereinafter "Def. Mem. II")). He defines the relevant comparison as the difference between the percentage of the distinct group on the qualified wheel on the date of the drawing of his venire and the community population at large. (Def.Mem. I, II, III). Although the defendant criticizes the absolute numbers approach, he does not advocate any specific method of comparison (Def. Mem. III at 18). Rather, he argues that the disparities are substantial under any method of comparison.

The defendant proffers calculations under various definitions and methods. He argues that a comparison of the community population at large with the qualified wheel on April 12, 1995 reveals an absolute disparity of 4.02% for African–Americans and 3.58% for Hispanics, a comparative disparity of 48.3% for African–Americans and 69.5% for Hispanics, and an absolute impact of 5.03 African–American jurors and 4.48 Hispanic jurors (on an average venire of 125). He states that a comparison of the racial composition of the community population eligible for jury service with the racial composition of the qualified wheel since its inception reveals an absolute disparity of 2.83% for African–Americans and 3.08% for Hispanics, a comparative disparity of 34.0% for African–Americans and 59.5% for Hispanics, and an absolute impact of 1.98 African–Americans and 2.68 Hispanics (on an average venire of 125). (Def. Mem. II, Tables A–E).

However, in calculating his percentages, the defendant does not exclude those individuals who did not indicate race on the completed questionnaire from the calculation. See n. 8, supra (explaining calculation). An exclusion of such individuals from the calculation reveals smaller disparities. Specifically, a comparison of the racial composition of the community population at large with the racial composition of the qualified wheel on April 12, 1995 reveals an absolute disparity of 3.98% for African–Americans and 3.55% for Hispanics, a comparative disparity of 47.78%

---

25. The defendant also suggests that the high disqualification rate for Hispanics is due to "overliberal use of the language disqualification factor." (Def. Mem. I at 23). However, the defendant does not include the language qualification among his identified systematic defects. Moreover, he provides absolutely no evidence to support this allegation. Thus, the court does not address it as a distinct claim.

for African–Americans and 68.53% for Hispanics, and an absolute impact of 4.97 African–Americans and 4.44 Hispanics (on an average venire of 125). A comparison of the racial composition of the community population eligible for jury service with the qualified wheel over the life of the wheel reveals an absolute disparity of 1.48% for African–Americans and 1.94% for Hispanics, a comparative disparity of 20.90% for African–Americans and 45.75% for Hispanics, and an absolute impact of 1.85 African–Americans and 2.42 Hispanics (on an average venire of 125).[26] (*See* Def. Mem. II, Tables A–E, Def. Exhs. E & X (and exclude "unknowns" from calculation)).

### 1. A Fair Cross–Section

■ The jury selection system for the New Haven division of the District of Connecticut has provided Mr. Rioux with a fair possibility for obtaining a cross-section of the community in his venire. A comparison of the racial composition of the relevant jury pool, the qualified wheel over the life of the wheel, and the racial composition of the community population, the population eligible for jury service, does not reveal substantial underrepresentation of minorities in the qualified wheel. Rather, it reveals a disparity of 1.85 African–Americans and 2.42 Hispanics on an average venire of 125 persons.

### a. The Community Population

The courts are in agreement that the relevant community population is the population eligible for jury service. *LaChance,* 788 F.2d at 865; *Rodriguez,* 776 F.2d at 1511; *Test,* 550 F.2d at 582; *Osorio,* 801 F.Supp. at 977 (citations omitted); *see also Taylor,* 419 U.S. at 524, 95 S.Ct. at 694–95 (focusing on population eligible for jury service). Although such precise data is not available, the 1990 census does dissect this community according to race and age. The voting-age population

in the New Haven division is 7.08% African–American and 4.24% Hispanic. (*See* Def. Exh. M (attachment)).

### b. The Relevant Jury Pool

The relevant jury pool in this case is the qualified wheel over the life of the wheel.

The defendant's claim, essentially, is that the failure to take affirmative steps in the construction of a qualified wheel to remedy known underrepresentation constitutes systematic exclusion. Thus, the parties and the court agree that the qualified wheel is the relevant pool of jurors.

The more difficult issue is the timeframe over which the qualified wheel should be measured. The defendant argues that the relevant point in time is April 12, 1995, the date of the drawing for his venire. He reasons that because the Sixth Amendment entitles a defendant to an "opportunity" for a representative venire, the qualified wheel must be representative on the date of the drawing for the venire in question. In other words, it must be representative on a daily basis.[27] The government argues that because the focus of the Sixth Amendment is on the proper functioning of the jury selection system and not on any particular venire, the relevant timeframe is the life of the qualified wheel that provided the names for the defendant's venire. (Govt. Supp. Mem. in Opp. at 13–14 (hereinafter "Govt. Mem. III")).

■ In this case, the court agrees with the government's contention that the appropriate timeframe is the life of the qualified wheel which provided the names for Mr. Rioux's venire. The inquiry of a Sixth Amendment claim is not the representation of any one pool of jurors, whether a qualified wheel, a venire, or a petit jury. *Taylor,* 419 U.S. at 538, 95 S.Ct. at 701–02; *Jackman,* 46 F.3d at 1246; *Ramseur,* 983 F.2d at 1234;

---

**26.** A comparison of the community population eligible for jury service with the qualified wheel on April 12, 1995 reveals an absolute disparity of 2.73% for African–Americans and 2.62% for Hispanics, a comparative disparity of 38.56% for African–Americans and 61.79% for Hispanics, and an absolute impact of 3.41 African–Americans and 3.28 Hispanics (on an average venire of

125). (*See* Def. Mem. II, Tables A–E, Def. Exh. X (and exclude "unknowns" from calculation)).

**27.** Mr. Rioux also argues that the qualified wheel averages are useful in determining whether the exclusion is systematic, but to underrepresentation itself only if the data is not available for a specific date. (Def. Mem. III at 8–10, 10 n. 8.).

*Test,* 550 F.2d at 589; *Osorio,* 801 F.Supp. at 975. The inquiry of a Sixth Amendment claim is the systematic exclusion of distinctive groups in the community. In other words, the inquiry is how the system of jury selection affects representation of distinct groups.

Thus, the court must assess representativeness in the context of the jury selection system. Because the defendant's claim must expose a systematic defect, the defendant's evidence must demonstrate that the overall system is unrepresentative. *Jackman,* 46 F.3d at 1246. In short, the third prong of the *Duren* test, systematic exclusion, is the crux of a Sixth Amendment claim. The identified systematic defect not only establishes the requisite relationship between the system and the alleged underrepresentation, but it defines both the relevant jury pool and the timeframe over which that pool must be examined—two elements critical to the determination of underrepresentation.

In this case, there is no reason to limit the analysis to April 12, 1995, the date of the drawing for Mr. Rioux's venire. Mr. Rioux's claims are not limited to any particular point in time. Although he identifies four systematic defects, these alleged defects can be divided two-fold. First, he argues that the district's failure to take affirmative steps in its construction of the qualified wheel to remedy known underrepresentation, even if caused by nongovernmental forces, constitutes systematic exclusion. Second, he argues that the district's failure to comply with procedural requirements of the Act and Plan precluded effective detection and remedy of the alleged underrepresentation. These claims relate to the overall system, not to any discrete malfunctioning of the system.

Thus, the most appropriate evidence is that which reflects upon the overall representativeness of the system—the racial composition of the qualified wheel from its inception until the time of this hearing.[28] An analysis of the New Haven qualified wheel during this time period reveals 5.6% African–American representation and 2.3% Hispanic representation. (*See* Def. Exh. E (and exclude unknowns from calculation)).

### c. The Method of Comparison

As noted, this circuit has employed the absolute impact measure as the determinant of underrepresentation since *Jenkins. Maldonado–Rivera,* 922 F.2d at 970; *Biaggi,* 909 F.2d at 678; *Jenkins,* 496 F.2d at 66. Although the Second Circuit declined to apply the absolute impact measure to the functional wheel in *Jackman,* the court did not depart from the established line of cases recognizing absolute impact as the appropriate measure of underrepresentation in most cases. Rather, it merely concluded that Jackman had satisfied the substantial underrepresentation prong of *Duren* without adopting or even

**28.** The court does not mean to suggest that it would never limit its analysis to any discrete time period or point in time. For example, there is some evidence in the record which suggests that a failure to replenish the qualified wheel during Magistrate Judge Margolis' absence seriously diminished minority representation in the qualified wheel by the time of the drawing for Mr. Rioux's venire. A careful reading of Magistrate Judge Margolis' reports reveals that as the court executed additional mailings of questionnaires, particularly follow-up questionnaires to non-responders, minority representation in the qualified wheel increased significantly. (Exh. K–R). More specifically, the qualified wheel began with a 4.2% representation of African–Americans and a 2.0% representation of Hispanics in October 1993. By June of 1994, after six additional mailings, including two follow-up mailings to non-responders, the qualified wheel was 5.3% African–American and 2.3% Hispanic. By the time of the drawing for Mr. Rioux's venire on April 12, 1994, minority representation decreased to

4.31% African–American and 1.6% Hispanic. If the record contained the requisite evidence with respect to subsequent mailings and summonses during the magistrate judge's absence, the court would necessarily limit its focus to the June 1994–April 1995 timeframe, measuring representation as of April 12, 1995.

However, even assuming that additional evidence could establish the requisite relationship between the failure to replenish the qualified wheel and the diminished representation of minorities in the qualified wheel, the underrepresentation existing on April 12, 1995 is not substantial enough to constitute a Sixth Amendment violation. A comparison of the community population eligible for jury service with the qualified wheel on April 12, 1995 reveals an absolute disparity of 2.73% for African–Americans and 2.62% for Hispanics and an absolute impact of 3.41 African–Americans and 3.28 Hispanics on an average venire of 125. These disparities are significantly lower than those accepted in *Biaggi. See* n. 31.

applying a substitute measure of underrepresentation. *Jackman*, 46 F.3d at 1245–48.

Moreover, although the court criticized the absolute impact measure in general terms, it identified the unique circumstances of *Jackman*—the lack of a uniform source list to measure overall representativeness and the less than "benign" procedure employed by the jury clerk—as its primary reason for declining to apply absolute impact in that case. *Jackman*, 46 F.3d at 1247–48. Thus, in the absence of such unique circumstances, absolute impact governs as the method of comparison.

Such unique circumstances do not exist in this case. First, there is not only a uniform source of names or "pre-established source list" in this case, but the evidence includes an analysis of the overall representativeness of the system. *See Jackman*, 46 F.3d at 1247–48. Second, the circumstances of this case are not any "less benign" than the use of voter registration lists in *Biaggi.*

■ The defendant is very critical of the district's failure to adopt the recommendations of Magistrate Judge Margolis in a speedy fashion. The court, however, does not interpret this evidence as a less than "benign" circumstance. First, the reports of a magistrate judge monitoring a jury selection system are not the equivalent of a formal finding that a particular jury selection system is unconstitutional. *Compare Jackman*, 46 F.3d at 1247 ("The underrepresentation of Hartford and New Britain residents continued for more than a year after disclosure of constitutional infirmities in the selection process.") (discussing *Osorio*, 801 F.Supp. 966). Second, the magistrate judge herself did not conclude that the qualified wheel reflected unconstitutional representa-

tion. Rather, she pointed out the existence of underrepresentation, ranging from 2.08% to 2.88%, and discussed both potential causes and remedies.[29] (*See* Def.'s Exhs. K–R). Prior to *Jackman*, these disparities were not questionable.

More importantly, though, this is not a district where even constitutionally acceptable disparities are ignored, but a district that continues efforts to increase minority representation. In fact, this district has expended considerable resources to increase the representation of minorities in the system. It voluntarily expanded its source list beyond the voter registration lists to include the motor vehicle operators list. (Def. Exh. A at Section VI). It began follow-up mailings to non-responders. It appointed a magistrate judge and an oversight committee to monitor the jury selection process. As the magistrate judge's reports reveal, it has been a time-consuming task. (*See* Defs. Exhs. K–R).

Moreover, the court has every confidence that the judges in this district will fully evaluate the recommendations of Magistrate Margolis, now that she has returned from her leave of absence. In short, the actions of this district, with respect to minority representation, are not in any way constitutionally suspect.

Thus, the absolute impact measure of underrepresentation governs this case. An absolute impact analysis reveals a disparity of 1.85 African–Americans and 2.42 Hispanics on an average venire of 125.[30] In comparison to *Biaggi*, which involved an absolute impact of two African Americans and two to three Hispanics on an average venire of 60, 909 F.2d at 677–78,[31] the absolute impact of underrepresentation in this case is well within

**29.** Again, the court notes that representation of minorities in the qualified wheel increased significantly over the course of Magistrate Margolis' regular reports. *See* n. 28, *supra*.

**30.** Clerk Rowe testified that an average venire in the New Haven division consists of 60 to 120 individuals. (Testimony of Clerk Rowe). Because the defendant proffers calculations using the number 125 and because the court does not consider this variable in any way determinative,

the court also employs 125 as the average size of a venire.

**31.** Although neither the Second Circuit nor the district court explicitly stated that the typical venire in the Southern District of New York consisted of 60 persons, the district court was following *Jenkins*, 496 F.2d at 66, which employed the number 60, and the final *Biaggi* calculations can be understood by multiplying the identified percentage disparities by 60. *Biaggi*, 680 F.Supp. at 655.

acceptable limits.[32] In short, there is no unfair representation of African Americans or Hispanics in the qualified wheel of the New Haven division.

### 2. Systematic Exclusion

The above findings with respect to representation are sufficient to deny the defendant's Sixth Amendment claim. However, in light of the state of the law after *Jackman*, and in the interest of efficiency, the court addresses the third prong of the *Duren* test. Assuming, arguendo, that unfair representation exists in the qualified wheel, the defendant has not satisfied the systematic exclusion prong of *Duren*.

A statistical disparity alone is not sufficient. *Pion*, 25 F.3d at 23; *Garcia*, 991 F.2d at 492; *Barber*, 772 F.2d at 997; *Test*, 550 F.2d at 586–87; *Anderson v. Casscles*, 531 F.2d at 685; *Gruberg*, 493 F.Supp. at 246–47. The defendant must establish that such underrepresentation is "due to the system" by which juries are selected in this community. *Duren*, 439 U.S. at 364, 99 S.Ct. at 668. In other words, the defendant must identify the specific systematic defects or operational deficiencies that caused the alleged underrepresentation. *Pion*, 25 F.3d at 23. Discrepancies caused by private sector influences, rather than affirmative governmental action, are not systematic discrepancies. *Cecil*, 836 F.2d at 1446–47; *Barber*, 772 F.2d at 997; *Test*, 550 F.2d at 586–87.

Again, the defendant's four claims are, in essence, two claims. He identifies the failure to take affirmative measures to rectify underrepresentation caused by demographic patterns and a high disqualification rate for Hispanics, and the failure to comply with the procedural provisions of the Act and Plan, as systematic defects which create and preserve underrepresentation in the qualified wheel. Because these claims, by definition, would impose affirmative obligations on the courts, they necessarily must fail.

■ The underrepresentation complained of by the defendant is not "due" to any element of the jury selection system in the New Haven division. Rather, it is "due" to such private sector influences as voting patterns, demographic trends, and cultural differences. Because the Sixth Amendment does not impose an affirmative obligation on the courts to counteract such influences, the failure to do so cannot constitute systematic exclusion.[33]

■ Moreover, the Sixth Amendment does not comprehend detailed procedural obligations, such as personal service of summonses by the United States Marshal, or minute record-keeping of all undelivered questionnaires, or even public notice of drawings. It comprehends " 'a fair possibility for obtaining a jury constituting a representative cross-section of the community.' " *Taylor*, 419 U.S. at 528, 95 S.Ct. at 697 (quoting *Peters v. Kiff*, 407 U.S. at 500, 92 S.Ct. at 2167). In short, as long as the jury selection process is reasonably open to all, "a process that comports with the need for efficient jury selection" also comports with the Sixth Amendment, "even though it may not perfectly reflect population." *Barber*, 772 F.2d at 997. Because the defendant has adduced no evidence to suggest that the jury selection process in the New Haven division is not reasonably open to all, or, in other words, because the defendant has not demonstrated that the alleged failure to adopt the identified

---

**32.** The court recognizes that the comparative disparity for Hispanics is much greater in this case than in *Biaggi*. In this case, the comparative disparity is 45.75%, as compared to 29.93% in *Biaggi*. However, because the circumstances of this case are not any less "benign" than what occurred in *Biaggi*, because comparative disparity overstates representation in communities such as New Haven (where Hispanic representation is less than 10%), and because there is no suggestion in *Jackman* that the Second Circuit would substitute comparative disparity for absolute impact, the court does not consider this comparison meaningful.

**33.** With respect to the language qualification, it is well-established that the government may establish reasonable qualifications for jury service. *Duren*, 439 U.S. at 370, 99 S.Ct. at 671–72; *Taylor*, 419 U.S. at 534–35, 95 S.Ct. at 699–700. Because there is no suggestion that the language qualification is overbroad or improper in any other way, and no evidence to support the allegation that the qualification is applied improperly, it can not support a claim of systematic exclusion.

procedures in any way detracted from representativeness, these claims also must fail.

## II. *The Jury Selection and Service Act*

The Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 *et seq.* (hereinafter "the Act"), provides that "all litigants in Federal Courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross-section of the community." 28 U.S.C. § 1861. The Act provides for dismissal of an indictment or a stay of the proceedings when there has been a "substantial failure" to comply with its provisions. 28 U.S.C. § 1867(d). However, a defendant must file such a motion before voir dire or seven days after the violation is discovered or could have been discovered, whichever is earlier. 28 U.S.C. § 1867(a).

Although the Supreme Court has not addressed the issue, the majority of lower courts have interpreted the Act as codifying the fair cross-section requirement of the Sixth Amendment. Under this interpretation, the *Duren* test governs both constitutional and statutory challenges. *United States v. Miller,* 771 F.2d 1219, 1227 (9th Cir.1985); *LaChance,* 788 F.2d at 864 (citing *United States v. Clifford,* 640 F.2d 150, 154–55 (8th Cir.1981); *see Taylor,* 419 U.S. at 528–30, 95 S.Ct. at 697–98 ("Recent federal legislation [the Act] governing jury selection within the federal court system has a similar thrust [to the sixth amendment's representative cross-section requirement]")); *Test,* 550 F.2d at 584 (citing *United States v. Whiting,* 538 F.2d 220, 222 (8th Cir.1976); *Anderson v. Casscles,* 531 F.2d at 685, 685 n. 1 (dictum); *United States v. Tijerina,* 446 F.2d 675, 679–81 (10th Cir.1971)); *Osorio,* 801 F.Supp. at 973 n. 7 (citations omitted); *Gruberg,* 493 F.Supp. at 245–46.

Nevertheless, some courts, identifying specific statutory language, have suggested that "the Act may impose a higher duty to take affirmative steps to remedy discrepancies between the composition of jury panels and the composition of the underlying community."

*Gruberg,* 493 F.Supp. at 246–47. Specifically, although the Act mandates the use of voter registration lists as the primary source of jurors, section 1863(b)(2) requires the courts to correct any substantial percentage deviations by the use of supplemental lists. 28 U.S.C. § 1863(b)(2).[34]

Yet, no court addressing this issue has required a district to supplement the voter registration lists in creating jury wheels. *Cecil,* 836 F.2d at 1447 (citing *Afflerbach,* 754 F.2d at 869–70); *Warinner,* 607 F.2d at 214; *Brady,* 579 F.2d at 1134; *James,* 528 F.2d at 1022; *Lewis,* 472 F.2d at 256; *Camp,* 413 F.2d at 421; *Caci,* 401 F.2d at 671; *Kelly,* 349 F.2d at 778 (upholding use of voter registration lists as sole source of potential jurors in each case). Perhaps this is because, as one court stated:

> Courts ... have generally regarded this language to refer to 'substantial percentage deviations' arising out of some discriminatory practice such as that earlier pursued by the jury commissioners in *Duren* ... and has never been understood to refer to any underrepresentation created simply because some members of a class itself had by sloth failed to register. Actually, it is likely that Congress, writing in the midst of the civil rights legislation, was thinking of the possible vestiges of discrimination in registration to vote that might have remained in certain areas and wished to offer some safeguard against that condition by this provision for supplementation.

*Cecil,* 836 F.2d at 1448 (citing 42 U.S.C. § 1973 *et seq.*).

However, at least the Second Circuit has suggested that the Act may require use of supplemental sources when the voter registration lists do not achieve a fair and reasonable cross-section, even in the absence of systematic discrimination. *Jenkins,* 496 F.2d at 65. In *United States v. Fernandez,* 480 F.2d 726 (2d Cir.1973), the Second Circuit, interpreting § 1863(b)(2), stated in dictum:

**34.** Section 1863(b)(2) provides, in pertinent part: "The plan shall prescribe some other source or sources of names in addition to voter lists when necessary to foster the policy and protect the rights secured by sections 1861 and 1862 of this title." 28 U.S.C. § 1863(b)(2).

Whether such affirmative measures are necessary only when there is evidence of 'systematic discrimination' in the composition of voting lists or also when voluntary voting patterns create a statistical deviation from the cross-section of the community seems to have created a difference of opinion among courts which have considered the problem.

480 F.2d at 734 n. 12 (citing *United States v. Guzman,* 468 F.2d 1245, 1247–49 (2d Cir. 1972); *United States v. James,* 453 F.2d 27, 29 (9th Cir.1971); *United States v. Arnett,* 342 F.Supp. 1255 (D.Mass.1970); *Broadway v. Culpepper,* 439 F.2d 1253, 1254–55 (5th Cir.1971)). In *Anderson v. Casscles,* the Second Circuit interpreted *Fernandez* as indicating "that the Act may impose a greater duty than the Constitution." *Anderson v. Casscles,* 531 F.2d at 685 n. 1 (citing *Fernandez,* 480 F.2d at 734 n. 12). Finally, in *Jenkins,* the Second Circuit concluded that "at least where color is involved, the Act goes 'beyond · prohibition of intentional distortions and provides that in certain cases affirmative measures must be undertaken to insure than juries are selected at random from a fair cross-section of the community.'" 496 F.2d at 65 (quoting *Fernandez,* 480 F.2d at 733).[35]

However, research discloses no case which even suggests that § 1863(b)(2) requires affirmative action outside the context of source lists.[36] In *Gometz,* the defendant argued that because blacks were overrepresented among non-responders, the Act required the district to take affirmative measures to correct the low response rate. 730 F.2d at 482. The court held that the Act did not require such affirmative measures. *Id.* More specifically, the court held that the provisions of the Act empowering court clerks to follow-up on non-responders were discretionary provisions, enacted to enable "the jury system to be preserved in the unusual situation where the response rate is so low that there are not

enough responders to stock the juries required for trials in the district." *Id.* at 480.

The court reasoned that Congress, in enacting the Jury Selection and Service Act, was concerned about widespread and discriminatory exclusion of particular groups, not "anything so esoteric as non-response bias." *Gometz,* 730 F.2d at 482. More importantly, because it is the absolute and not the relative size of the sample that determines its reliability, an interpretation of the Act that required affirmative measures to improve response rates could not be limited to cases of very low response rates:

Suppose the rate had been not 30 but 95%; and suppose further, as is the case, that the population from which the sample was drawn ... was less than 5% nonwhite. Then if the nonresponse rate were heavily concentrated among nonwhites, ... even a 95% response rate might produce substantial underrepresentation, or even complete nonrepresentation, of nonwhites. Yet extreme measures would be required to obtain a higher rate.... It is therefore apparent that the hearing Gometz has asked for would be just the first step toward far-reaching changes in the method of federal jury selection that Congress did not contemplate when it passed the Jury Selection and Service Act.

*Id.* Thus, the Seventh Circuit did not interpret the Jury Selection and Service Act to require affirmative measures to correct underrepresentation beyond the initial source list, where such underrepresentation was created by unintentional private sector influences. *Id.; see also United States v. Santos,* 588 F.2d 1300, 1303 (9th Cir.1979) (holding that § 1864(a) provides for discretionary follow-up); *United States v. Carmichael,* 685 F.2d 903, 912 (4th Cir.1982) (rejecting challenge to 70% response rate).

■ A substantial violation of the Act occurs only when the alleged violation frus-

---

**35.** Yet, in *Jenkins* also, the court held that a disparity of 2.15% did not mandate resort to a supplemental source of potential jurors. *Jenkins,* 496 F.2d at 64.

**36.** *See also United States v. Gometz,* 730 F.2d 475, 479–80 (7th Cir.1984), *cert. denied,* 469 U.S. 845, 105 S.Ct. 155, 83 L.Ed.2d 92 (1984) (quot-

ing S.Rep. No. 891, 90th Cong., 1st Sess. 17, U.S.Code Cong. & Admin.News 1968, p. 1792 (1967) ("The act ... does not require that at any stage beyond the initial source list the selection process shall produce groups that accurately mirror community makeup. Thus, no challenge lies on that basis.").

trates the Act's principles of random selection and objective determination of juror disqualification, exemptions and excuses. *United States v. Bearden,* 659 F.2d 590, 601 (5th Cir.1981), *cert. denied sub nom. Northside Realty Assoc. v. United States,* 456 U.S. 936, 102 S.Ct. 1993, 72 L.Ed.2d 456 (1982). A technical violation of the Act's detailed jury selection procedures does not constitute a "substantial failure" to comply with the statute. *United States v. Capone,* 683 F.2d 582, 589 (1st Cir.1982); *Bearden,* 659 F.2d at 601; *United States v. Davis,* 546 F.2d 583, 589 (5th Cir.1977). For example, the failure to conduct a public drawing, or to post notice of a drawing for jury selection, is a "technical" violation of the Act. *Capone,* 683 F.2d at 589. Thus, such inaction does not constitute a substantial failure to comply with the Act's provisions. *Id.;* *see also United States v. Cabrera–Sarmiento,* 533 F.Supp. 799, 810 (S.D.Fla.1982) (holding that failure to give adequate public notice was not a substantial violation of the Act).

■ In summary, the test for a violation of the cross-section requirement of the Sixth Amendment and the Jury Selection and Service Act is substantially the same. In other words, the *Duren* test governs both constitutional and statutory challenges—except that the Act may require supplementation of the voter registration lists where necessary to advance the policies of the Act. However, Congress left this determination to the courts and, to date, no court has invalidated the use of voter registration lists as the sole source of jurors. Moreover, no court has interpreted the Act to impose an affirmative obligation, outside the context of source lists, to correct underrepresentation created by private sector influences. Furthermore, research discloses no case which equates a technical violation of the Act's procedural requirements with a "substantial failure" to comply with the Act's provisions. In other words, a technical violation of detailed procedural requirements is not a systematic defect

or operational deficiency sufficient to form the basis of a claim of systematic exclusion.

The defendant claims that each of his four identified systematic defects, *see* Discussion ID (Defendant's Claims), violate the Act. The government argues that the defendant's motion is untimely under the Act, that the Act does not require affirmative measures to remedy underrepresentation in this context, and that the alleged technical violations of the Act do not constitute a substantial failure to comply with the Act.

■ The defendant's motion is timely under the Act. As far as the record reveals, the defendant became aware of the paucity of minorities on his venire on April 27, 1995. (Govt. Exh. 1 (Memorandum of Kevin Rowe)). The defendant filed his motion on May 8, 1995, before jury selection. Excluding weekends, *see* Fed.R.Civ.P. 6(a) and Local Rule 1, the defendant filed his motion before voir dire and within seven days of discovering the potential violation. There is no evidence to suggest that the defendant should have become aware of the alleged underrepresentation prior to April 27, 1995. Thus, the motion satisfies § 1867(a). 28 U.S.C. § 1867(a).

■ However, the motion does not establish a substantial failure to comply with the Act. 28 U.S.C. § 1867(d). First, assuming that underrepresentation does exist,[37] and that such representation would require affirmative steps to remedy non-systematic underrepresentation, this district has already supplemented the voter registration lists with the motor vehicle operators list. (Def. Exh. A at Section VI). Nothing in the Act or in any other law imposes an affirmative obligation on the courts to counteract private sector influences beyond the source lists, the initial stage of the selection process. *Gometz,* 730 F.2d at 479–80; *Santos,* 588 F.2d at 1303; *Carmichael,* 685 F.2d at 912. Thus, the failure to adopt the recommendations of the magistrate, with respect to increasing minority representation in the qualified

**37.** Because the *Duren* test governs both constitutional and statutory challenges, the court's findings with respect to representation under the Sixth Amendment claim control the claim under the Act as well.

wheel, is not a violation of the Act or the policies advanced by the Act.

■ Second, the provisions of the Act and Plan empowering the court to order personal service of summonses by the United States Marshall are discretionary provisions. *Gometz,* 730 F.2d at 480; *Santos,* 588 F.2d at 1301; *see also* the Plan, § X. The failure to act on discretion is not in any sense a violation of the Act.

■ Finally, the provisions of the Act requiring public notice of drawings and maintenance of a list of names of persons who could not be served are technical requirements. In other words, violations of these provisions are technical violations of the Act. *See Capone,* 683 F.2d at 589; *Cabrera-Sarmiento,* 533 F.Supp. at 810 (holding that failure to provide notice of drawing was a technical violation of the Act but not a substantial failure to comply with the Act). Because technical violations of the Act are not a "substantial failure" to comply with the provisions of the Act, this division's failure to maintain the requisite list [38] and to provide public notice of drawings do not constitute a substantial failure to comply with the Act. *See LaChance,* 788 F.2d at 870; *Capone,* 683 F.2d at 589; *Bearden,* 659 F.2d at 601; *Davis,* 546 F.2d at 589 (stating that technical violations of procedures prescribed by the Act do not constitute a substantial failure to comply with the Act).

### III. *Equal Protection*

The Supreme Court has established a three-pronged test to determine whether a jury selection process violates the equal protection clause of the Fourteenth Amendment. *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977).

> The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under

the laws, as written or as applied. Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as ... jurors, over a significant period of time.... Finally, as noted above, a selection procedure that is not racially neutral supports the presumption of discrimination raised by the statistical showing.

*Id.* at 494, 97 S.Ct. at 1280 (citations and footnote omitted). Although this test is very similar to the *Duren* test, there are two critical distinctions between *Castaneda* and *Duren* in this circuit.

■ First, an equal protection claim requires proof of discriminatory intent. *See Biaggi,* 909 F.2d at 677 n. 4 (expressing doubt but reaffirming *Alston,* 791 F.2d at 257–58 (interpreting *Castaneda* to require proof of discriminatory intent)); *but see Jackman,* 46 F.3d at 1254 (Walker, J. dissenting) (stating that "it is not so clear that discriminatory intent need be proven when a defendant, as a third-party proponent of the rights of minority jurors, challenges the exclusion of minorities from all jury service."). Second, the recognized measure of underrepresentation in the equal protection context is statistical decision theory. *Alston,* 791 F.2d at 258.

■ The defendant here raises his own equal protection claim, as well as the third-party equal protection claims of potential jurors (Def. Mem. I at 26–32). However, the defendant did not proffer any calculations of statistical decision theory until submission of a third supplemental brief, filed after the conclusion of the hearing and in response to the court's request for further briefing of the potential measures of underrepresentation in the Sixth Amendment context.[39] More importantly, the defendant did not proffer any expert testimony regarding the mathematical calculations or the statistical significance of

---

**38.** The Plan requires the Clerk of the court to prepare a "list of persons" who could not be located either by mail or through personal service by the marshal. (Exh. A at 10). The New Haven division maintained a list according to community and quantity and preserved the returned questionnaires. (Testimony of Clerk Rowe).

**39.** The court notes that statistical decision theory has been the accepted measure of underrepresentation for equal protection claims in this circuit since 1985. *Alston,* 791 F.2d at 258.

such calculations. Without the aid of such expert testimony, the court cannot accept the defendant's proffer of statistical decision theory in his third supplemental brief. *See Alston*, 791 F.2d at 256; *Osorio*, 801 F.Supp. at 973, 979 n. 12; *Villafane v. Manson*, 504 F.Supp. 78, 80 n. 2, 84 n. 9 (D.Conn.1980) (employing expert testimony on statistical decision theory). Thus, the defendant has failed to satisfy the substantial underrepresentation prong of *Castaneda*.

More importantly, there is absolutely no evidence in this case of discriminatory intent. As the defendant concedes, "the defendant has discovered no evidence of intentional discrimination by those in charge who oversaw the juror selection system." (Def. Mem. I at 29).

Although the defendant argues that statistical evidence of underrepresentation "coupled with an opportunity to discriminate is sufficient" to satisfy the intent requirement, *see* Def. Mem. I at 29 (citing *Castaneda*, 430 U.S. at 494–95, 97 S.Ct. at 1280), the defendant `has failed to establish that the jury selection process in the New Haven division was susceptible of abuse. More specifically, he failed to demonstrate that the division's failure to maintain a list of names of all persons to whom questionnaires could not be delivered, or its failure to provide public notice of drawings, in any way made the jury selection system susceptible of abuse or open to discrimination.[40] Although the defendant further argued to the court that inaction by the district judges constitutes a subjective cause of the underrepresentation, or, in other words, a passive form of intent, this argument is moot in light of the court's findings with respect to underrepresentation. Thus, the defendant's equal protection claims must fail.

## IV. *Due Process*

The defendant argues that the violations of the Sixth Amendment and the violations of the Jury Selection Service Act also violate his substantive and procedural due process rights. In light of the court's disposition of the Sixth Amendment and Jury Selection and Service Act claims, the defendant's due process claims also fail.

## *CONCLUSION*

Accordingly, the defendant's motion to dismiss the indictment, or, alternatively, the jury [Doc. No. 49] is denied.

**SO ORDERED.**

---

**40.** Clerk Rowe testified, for example, that the drawing of names from the master wheel and the qualified wheel is a computerized process. When the GSA draws names for the qualified wheel, it does so according to the random quotient established in the Plan. When the GSA completes a drawing, it certifies that it has complied with the Plan. (Testimony of Clerk Rowe).