**UNITED STATES of America, Appellee,**

v.

**James FIELDS; Christopher Crawley, Defendants–Appellants.**

**Nos. 431, 432, Dockets 96–1168, 96–1257.**

United States Court of Appeals, Second Circuit.

Argued Oct. 10, 1996.

Decided May 12, 1997.

William M. Bloss, New Haven, CT (Jacobs, Grudberg, Belt & Dow, of counsel), for Defendant–Appellant Christopher Crawley.

Cheryl J. Sturm, West Chester, PA (Thomas G. Dennis, Federal Public Defender for the District of Connecticut, Hartford, CT, filed brief), for Defendant–Appellant James Fields.

Jeffrey A. Meyer, Assistant United States Attorney, New Haven, CT (Christopher F. Droney, United States Attorney, John H. Durham, Deputy United States Attorney, John A. Danaher III, Executive Assistant United States Attorney, Robert O. Hickey, Law Student Intern, on the brief and of counsel), for Appellee United States of America.

Before: OAKES, CARDAMONE, and MAHONEY*, Circuit Judges.

---

* The Honorable J. Daniel Mahoney, who was a member of the panel, died on October 23, 1996, and the appeal is being decided by the remaining two members of the panel, who are in agreement. *See* Local Rule § 0.14(b).

CARDAMONE, Circuit Judge:

On a dark December night in 1994 two New Haven, Connecticut police officers, acting on a tip from a reliable informant, stood in the side yard of a three-family apartment house and peered into a window whose shade was partially raised. Although the bedroom they observed was that of a nine-year-old boy—decorated in "Sesame Street" style—its occupants were two adults, the defendants James Fields and Christopher Crawley, who were "bagging" $40,000 worth of crack cocaine for resale. The police subsequently entered the apartment, without a warrant, and arrested both defendants.

The question we are called upon to answer is whether the action of the police of looking in the window constituted an unjustifiable intrusion on defendants' privacy so as to violate the Fourth Amendment. Although most people prefer their personal life to remain secret, those who desire privacy must take reasonable steps to secure it. When a person's activities are conducted with no sense of privacy, society will not recognize a subjective preference for secrecy as reasonable. Here, defendants failed to take the minimal steps necessary to render their expectations of privacy reasonable—the police surveillance, therefore, does not violate defendants' Fourth Amendment rights.

## BACKGROUND

### The Setting

The New Haven apartment at 381 Edgewood Avenue where Fields and Crawley were arrested was the primary residence of Carlyn Warner, who rented it and lived there with her daughter and nine-year-old son. The ground floor apartment is one of three in the building. In July 1994 defendant Fields began using it several times a week to cook and cut crack cocaine. Beginning in the fall of 1994 he started paying Warner $125 per week for the privilege. He had a key and could come and go as he pleased, even when Warner was absent. Warner testified that in

the six months prior to his arrest, Fields—usually accompanied by Crawley—came to the apartment 40 or 50 times, and on the night of their arrests, both defendants were present with her express permission. Although Fields and Crawley occasionally drank beer and watched television in the apartment, the primary reason for their presence was business. Neither defendant lived at that address, kept clothing or personal items on the premises or was named on the lease.

The defendants conducted their cocaine operations in the bedroom of Warner's son. Located in the rear of the apartment, it has two windows, both of which face onto the apartment house's side yard, which is partially enclosed by a chain link fence. Warner testified that when Fields and Crawley were in the bedroom with the door shut, she would not disturb them.

### The Events of December 15, 1994

On the night of the arrests, December 15, 1994, the defendants arrived together at 7:00 p.m., and went right to the rear bedroom to bag crack cocaine. They stayed in the bedroom throughout the evening. At 7:45 p.m., some 45 minutes after the defendants had arrived at the apartment, New Haven Police Lieutenant William White received a telephone call from a "known and reliable" informant. Lt. White was leader of the police department's intelligence unit, specializing in investigations of drug-dealing street gangs.

The informant—who had in the past given Lt. White information leading to arrests—informed him that James Fields and a person known as "Chris" were bagging crack cocaine at the rear apartment on the first floor of a woman's house located at 381 Edgewood Avenue. The informant advised Lt. White that the defendants' activities were visible through the window and that "they were at the point where they could leave at any time." The informant also identified the defendants' car as a blue Buick, provided the license plate number, and told the officer where it was parked.

Fields and Crawley were well-known to the police. Fields had been identified as the leader of a violent narcotics gang known as

the Hurlburt Street Posse, and previously had been arrested and convicted on narcotics-related charges. Crawley was known to associate with Fields and lived in the area where Fields' gang operated. Because the informant said that the defendants would be leaving shortly, Lt. White did not believe he had time to get a search warrant, even were this "raw information" sufficient to support its issuance, which he doubted. Instead, he assembled a team of investigators to check out the tip.

The police arrived at Edgewood Avenue at 8:25 p.m. and examined the area. It was dark out. In a driveway on an adjacent street, officers found the blue Buick in the location and with the license plate the informant had described. Lt. White and another officer set off for the 381 Edgewood Avenue premises. Because they could not see into the windows of Warner's apartment from the public sidewalk or from the street, Lt. White and his fellow officer entered the fenced-in rear yard and from there went into the fenced-in side yard to see into the building better. At the rear of the side yard, the officers found a window whose venetian blinds were raised five or six inches. Upon looking in, they saw Fields and Crawley in a well-lit bedroom bagging what appeared to be crack cocaine. Defendants were clearly visible from the side yard and the officers did not need to stand on tiptoes or to lean against the house to see inside the bedroom.

It was now 9:00 p.m., 75 minutes after the informant had called and advised the police that the defendants would be leaving "shortly." The district court later found that it would have taken the police over an hour to get a warrant, although concededly they did not attempt to do so after looking in the window. Instead, they devised a plan either to roust the defendants from the building or to gain entry themselves. Two uniformed officers were to knock at the front door, while Lt. White and three others would wait in the rear. The occupants of the bedroom on being discovered would presumably run out the back door with the drugs right into the hands of the waiting police.

The plan did not work. When Lt. White and the other officers entered the rear yard in order to get into position, a man on the back porch yelled out "5–0," a slang term for "police," and then went inside the building, closing the door behind him. The officers, knowing that Fields had a history of violence and that he might be armed, and believing that the alerted defendants would destroy evidence, decided to enter the building immediately. They forced open the locked back door of the building using a battering ram and gained entry to the apartment through its open door. Shouting "police," the officers proceeded to conduct a security sweep of the apartment and secured its occupants. Fields and Crawley attempted to flee, but were apprehended in the front bedroom. In that bedroom under a mattress, police discovered a loaded semi-automatic weapon well within Fields' reach. The officers also observed what appeared to be crack cocaine on a table in the back bedroom.

After securing the apartment, two officers left to obtain a search warrant, which was brought to the house an hour and a half later. Meanwhile, Warner, after her rights were explained to her, consented in writing to a search of her apartment. When the officers returned with the warrant, the premises was searched, and 453.76 grams of crack cocaine were seized from the rear bedroom.

### Proceedings in the District Court

Fields and Crawley were indicted on one count of conspiring to distribute and one count of possessing with intent to distribute 50 or more grams of cocaine base, in violation of 21 U.S.C. §§ 846, 841(a)(1). Before trial, they moved to suppress the evidence seized at the apartment, and in connection with that motion, moved for disclosure of the informant's identity. The district court then ordered the government to produce the informant for an *in camera* interview outside the presence of defense counsel. After the interview was conducted, both of the defendants' motions were denied. Fields and Crawley later moved to dismiss the indictment or to stay proceedings on the ground that the New Haven jury pool from which the grand and petit juries were drawn was not selected in

conformity with the Fifth and Sixth Amendments and the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 *et seq.* The district court denied this motion as well.

Crawley entered a guilty plea to one count of the indictment, conditioned on his right to appeal from the denial of the motion to suppress. Fields proceeded to trial, and after four days a jury found him guilty on both counts of the indictment. Before sentencing, the defendants unsuccessfully moved to preclude application of both the statutory penalty and the Sentencing Guidelines for cocaine base. Fields was sentenced to 20 years in prison, eight years supervised release, a $25,000 fine, and a $100 special assessment. Crawley received a six year sentence, five years supervised release, and a $50 special assessment. From their judgments of conviction both defendants appeal. We affirm.

### DISCUSSION

On appeal defendants assert it was error: (1) not to suppress the seized evidence, (2) not to reveal the informant's identity, (3) to sentence them to penalties for "cocaine base," rather than the more lenient penalties applicable to "cocaine and its salts," (4) to impose a $25,000 fine on defendant Fields, and (5) to deny the motion to dismiss the indictment based on the procedures used to select the jury pool. We address each argument in turn.

### I The Suppression Motions

When reviewing rulings on motions to suppress, we examine the evidence before the district court in the light most favorable to the government, and will disturb factual findings only when they are clearly erroneous. *United States v. Fullwood,* 86 F.3d 27, 29 (2d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 442, 136 L.Ed.2d 338 (1996). Legal conclusions are reviewed *de novo.* Here, defendants contend that their Fourth Amendment rights were violated when the police, without a warrant, looked into the window and later used a battering ram to break down the door to gain access to the apartment.

## A. Standing to Challenge the Searches

The district court denied the defendants' suppression motions after determining—based on the defendants' relationships to the apartment—that neither defendant had standing to contest the validity of searches of the apartment's interior.

■ Fourth Amendment rights are personal, and may be enforced only by persons whose *own* protection under the Amendment has been violated. *Rakas v. Illinois,* 439 U.S. 128, 133–34, 99 S.Ct. 421, 424–26, 58 L.Ed.2d 387 (1978). To contest the validity of a search, a defendant must demonstrate that he *himself* exhibited an actual subjective expectation of privacy in the area searched, and that this subjective expectation is one that society is willing to accept as reasonable. *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979) (citing *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516–17, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)). A defendant lacks "standing" in the Fourth Amendment context when his contacts with the searched premises are so attenuated that no expectation of privacy he has in those premises could ever be considered reasonable. *See Rakas,* 439 U.S. at 137–38, 99 S.Ct. at 427–28.

■ Although the extent of a defendant's property or possessory interest in the place searched is a factor generally considered in determining the reasonableness of a defendant's expectation of privacy, *United States v. Osorio,* 949 F.2d 38, 40 (2d Cir. 1991), a defendant's lack of such an interest does not rule out the possibility that he may still show a reasonable expectation of privacy. *See Minnesota v. Olson,* 495 U.S. 91, 99, 110 S.Ct. 1684, 1689, 109 L.Ed.2d 85 (1990) (houseguest has legitimate expectation of privacy); *Rakas,* 439 U.S. at 143–44 n. 12, 99 S.Ct. at 430 n. 12. Residence may give rise to an expectation of privacy, *United States v. Babwah,* 972 F.2d 30, 35 (2d Cir.1992), but an individual may also have a "sufficient interest in a place other than his own home so that the Fourth Amendment protects him." *Rakas,* 439 U.S. at 142, 99 S.Ct. at 430. For instance, where a guest has permission to use an apartment, is given a key, and uses the apartment in the owner's absence, society may be prepared to recognize the guest's privacy, even though no property interest exists. *Jones v. United States,* 362 U.S. 257, 259, 80 S.Ct. 725, 730, 4 L.Ed.2d 697 (1960). Indeed, society recognizes as legitimate the expectation of privacy possessed by an overnight guest—even though he has at best a fleeting connection to his host's home. *Olson,* 495 U.S. at 98, 110 S.Ct. at 1688–89.

With these general principles in mind, we turn to the standing of each defendant.

■ 1. *FIELDS.* The district court concluded that Fields was incapable *per se* of having a legitimate expectation of privacy at 381 Edgewood Avenue because he was not a tenant or guest, but instead was simply a person who came to the apartment to cook and to prepare crack cocaine for resale. We are unable to adopt the trial court's view.

Fields had a significant connection to the Edgewood Avenue premises. He had a key from Warner, paid $125 per week for the privilege of using the apartment, made use of it on 40 or 50 occasions, could bring guests and, with minor restrictions, could come and go as he pleased, even if Warner was not present. We think these contacts sufficient to permit Fields to establish a legitimate expectation of privacy. *See Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (reaffirming holding in *Jones,* 362 U.S. at 259, 267, 80 S.Ct. at 730, 734, that houseguest who has key and uses premises in host's absence may have legitimate expectation of privacy even though he has no property interest, pays no rent, and has been in apartment only for a short time).

■ Whether Fields qualified as a tenant or sublessee is not determinative. Possessory interests defined in the common law, while sometimes helpful, contain distinctions that are largely historical and do not control the Fourth Amendment inquiry. *Id.* at 266, 80 S.Ct. at 733–34. A reasonable expectation of privacy does not depend upon a showing that a common law interest in property has been transgressed. *See* 439 U.S. at 143–44 n. 12, 99 S.Ct. at 430 n. 12.

Nor does the fact that Fields did not sleep at the apartment doom his Fourth Amend-

ment claim. Although *Olson* establishes that status as an overnight guest *can* give rise to a legitimate expectation of privacy, 495 U.S. at 99, 110 S.Ct. at 1689, it does not suggest that such status is required before a guest can have privacy in the home.

■ We also reject the government's argument that the illegal nature of Fields' activities made any expectation of privacy regarding the premises unreasonable. Privacy expectations do not hinge on the nature of defendant's activities—innocent or criminal. *United States v. Taborda*, 635 F.2d 131, 138 n. 10 (2d Cir.1980). In fact, many Fourth Amendment issues arise precisely because the defendants were engaged in illegal activity on the premises for which they claim privacy interests.

■ 2. *CRAWLEY.* Unlike Fields, Crawley did not possess a key to the apartment at 381 Edgewood, and he did not pay anything that could be characterized as "rent." When he visited the apartment, he did so solely as Fields' guest. Although Crawley spent the night in the apartment on one occasion, no evidence indicates he planned to do so on the night of the arrests. Rather, he was a guest in the apartment at Fields' invitation.

■ Based on these contacts, the district court held Crawley a "transient visitor" with no expectation of privacy. Crawley believes this holding conflicts with the Supreme Court's decision in *Olson*, 495 U.S. at 98–99, 110 S.Ct. at 1688–89, which held that overnight guests have a legitimate expectation of privacy in the homes of their hosts. We agree. Although the case itself addressed only *overnight* guests, we do not think whether a guest spends the night is dispositive. *See* 5 Wayne R. LaFave, *Search and Seizure* § 11.3(b), at 137 (3d ed. 1996) (noting that *Olson*'s rationale is equally applicable to guests who do not stay overnight). Instead, *Olson* stands for the proposition that any guest, in appropriate circumstances, may have a legitimate expectation of privacy when he is there "with the permission of his host, who is willing to share his house and his privacy with his guest." 495 U.S. at 99, 110 S.Ct. at 1689.

Here, Fields, whose arrangement with Warner permitted him to bring guests to the apartment, invited Crawley for a visit that lasted several hours before being interrupted by the police intrusion, and the circumstances make clear that Fields intended to share his privacy with Crawley. Society generally recognizes the legitimacy of privacy expectations held by guests who, like Crawley, have been invited to the premises by their host for an extended visit. Because Fields, as discussed above, had a sufficient interest in the apartment to establish a legitimate expectation of privacy, we believe Crawley, as his invited guest, had one as well.

### B. *The Window Search*

■ Although both defendants had a sufficient relationship to the premises and each other to permit them to establish a legitimate expectation of privacy in the Edgewood Avenue apartment, that does not end the inquiry. Defendants must also establish that they took advantage of that opportunity for privacy at the time of the window search by the police. Although society generally respects a person's expectations of privacy in a dwelling, what a person chooses voluntarily to expose to public view thereby loses its Fourth Amendment protection. *See California v. Ciraolo*, 476 U.S. 207, 213, 106 S.Ct. 1809, 1812–13, 90 L.Ed.2d 210 (1986). Generally, the police are free to observe whatever may be seen from a place where they are entitled to be. *Florida v. Riley*, 488 U.S. 445, 449, 109 S.Ct. 693, 696, 102 L.Ed.2d 835 (1989).

In the case at hand defendants conducted their illegal activities in plain view of a bedroom window facing onto the side yard—a common area accessible to the other tenants in the multi-family apartment building—in which they had no legitimate expectation of privacy. *See United States v. Holland*, 755 F.2d 253, 255 (2d Cir.1985) (individual tenants in multi-tenant buildings have no legitimate privacy expectations in common areas, even when guarded by locked doors). Although there was a plainly visible five- to six-inch gap beneath the venetian blinds, defendants took no steps to close it. Their illegal

activities, conducted in a well-lit room after dark, could therefore readily be seen by anyone standing in the side yard.

Citing our decision in *Taborda*, 635 F.2d at 138 n. 9, defendants assert the police were trespassing by being in the side yard and that therefore any observations made from that vantage point were automatically unlawful. Although police observations made when trespassing are usually improper, it is not the trespass itself which renders them unlawful. Instead, such observations generally violate Fourth Amendment rights simply because those observed cannot reasonably anticipate observation from vantage points obtained by trespassing. In such circumstances, society frequently respects as reasonable the expectation that such observations will not occur. The ultimate focus of Fourth Amendment analysis remains whether the defendant had a reasonable expectation of privacy in the place searched. *Katz*, 389 U.S. at 360, 88 S.Ct. at 516 (Harlan, J., concurring). Here, by conducting their activities in plain view of an area where others were free to come and go, defendants failed to demonstrate such an expectation.

Appellants' heavy reliance on *United States v. Blount*, 98 F.3d 1489 (5th Cir.1996), *reh'g en banc granted*, 104 F.3d 58 (5th Cir. 1997), is misplaced. There a police officer, acting on an informant's tip that a fleeing suspect might end up at a particular private dwelling, walked into that dwelling's partially enclosed rear yard, using a path not open to the general public. *Id.* at 1492–93, 1495. Leaning against the house and placing his face within inches of a small opening in a sheet of plywood covering a broken window, the officer observed activities that later led to seizure of evidence used against the inhabitants of the dwelling, not the fleeing suspect. A Fifth Circuit panel held that the police officer's actions violated the legitimate privacy expectations of the dwelling's occupants. *Id.* at 1495.

Two significant factors distinguish the instant case from *Blount*. First, unlike the house in *Blount*, 381 Edgewood Avenue is a multi-family building. While the inhabitants of the *Blount* house might have a reasonable expectation that persons uninvited by them would not visit their fenced back yard, the defendants here could have no such legitimate expectations, because the building in which they conducted their operations contained other apartments whose tenants were entitled to use the side yard without giving notice or having the defendants' permission. Second, the five- to six-inch opening beneath the blinds in this case, unlike the narrow gap in the plywood through which the police peered in *Blount*, was sufficiently large to be clearly visible from the interior of the room to anyone who cared enough about his privacy to close the blinds. *Blount*'s rationale is therefore inapplicable to the facts before us.

In sum, although the defendants could easily have shielded their activities from public view, they failed to take the simple and obvious steps necessary to do so. By exposing their illicit cocaine activities to the side yard—a place where they should have anticipated that other persons might have a right to be—defendants failed to exhibit a subjective expectation that they intended their dealings in the bedroom to be private. Hence, the police observations did not violate defendants' Fourth Amendment rights. Because we uphold the window search on this ground, we need not consider or decide whether it could also be justified by exigent circumstances or by Carlyn Warner's after-the-fact consent to the search of her apartment.

### C. *Entry Into the Apartment*

The defendants also moved to suppress the evidence seized at the apartment on the grounds that the officers (i) made a warrantless entry and (ii) failed to knock and announce their authority before entering the apartment through its open door from the common hallway to which they had gained entry using a battering ram. Judge Dorsey found the police actions justified by exigent circumstances. Because his finding is fact-specific we review it under the clearly erroneous standard. *United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir.1990) (en banc).

### 1. *Warrantless Entry*

Although warrantless entries into the home are presumptively unreasonable,

*Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980), warrant requirements must yield when exigent circumstances demand that police act speedily. *Warden v. Hayden,* 387 U.S. 294, 298–99, 87 S.Ct. 1642, 1645–46, 18 L.Ed.2d 782 (1967). We use six illustrative guides to aid in determining the need for quick action:

> (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause ... to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry.

*MacDonald,* 916 F.2d at 769–70.

Analyzing the facts before us in light of those guides it can be seen that: (1) bagging a large quantity of cocaine crack is a serious crime; (2) Fields had a reputation for violence and was in fact apprehended with a loaded automatic weapon within his reach; (3) probable cause was clearly established after the suspects identified by the informant were found by the police to be engaged in the commission of a crime; and (4) the suspects were present on the premises; (5) the police had good reason to believe Fields and Crawley would attempt to flee or to destroy evidence when they were alerted to the presence of the police; and (6) although the entry to the apartment through the open door was arguably peaceful, the entry to the hallway, accomplished by a battering ram, was not. Taken together, these facts support the exigent circumstances finding. Although the entry to the common hallway was not peaceful, factors (1) through (5) were sufficient to justify the district court's finding that immediate entry was necessary to avoid danger and the destruction of evidence.

### 2. *Failure to Knock–and–Announce*

[18, 19] Defendants further suggest that the officers' failure to make a peaceable entry into the apartment building hallway, coupled with their failure to knock-and-announce before entering the apartment through its open door, renders the evidence seized at the apartment inadmissible. On the contrary, we can perceive no clear error in the district court's determination that exigent circumstances in the case at hand excused noncompliance with the knock-and-announce rule. The common law rule requiring police first to knock and announce their authority and then be refused before entering a private dwelling is part of the Fourth Amendment inquiry—not the end of it. *See Wilson v. Arkansas,* 514 U.S. 927, 934–35, 115 S.Ct. 1914, 1918, 131 L.Ed.2d 976 (1995). And, as the Supreme Court has recently reiterated, noncompliance with the knock-and-announce rule is justified where the police have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or would lead to the destruction of evidence. *See Richards v. Wisconsin,* —— U.S. ——, ——, 117 S.Ct. 1416, 1421, 137 L.Ed.2d 615 (1997). Here, the sounding of the "5–0" alarm, combined with Fields' known potential for violence and the nature of the bagging operation, made it reasonable for the officers to believe that complying with the knock-and-announce requirement would be futile (because the occupants already knew the police were there), potentially dangerous (Fields might arm himself), and might lead to the destruction of evidence (the defendants could easily dispose of the drugs).

### II Non-Disclosure of the Informant's Identity

■ The next point we consider is whether it was wrong to deny defendants' motion for the disclosure of the identity of the confidential informant. The trial judge determined, after interviewing the informant *in camera,* that there was no inconsistency between the informant's testimony and that of the police and that the informant had no exculpatory information. Prior to the interview, from which they were excluded, defense counsel were permitted to suggest areas of possible inquiry. They now declare that disclosure of the informant's identity was essential because the informant's testimony was relevant on the issue of probable cause and useful for the resolution of incon-

sistencies in testimony at the suppression hearing. In their view, the district court's questioning of the informant outside defense counsel's presence was inadequate to protect defendants' rights.

■ The government is not generally required to disclose the identity of confidential informants. *Roviaro v. United States,* 353 U.S. 53, 59, 77 S.Ct. 623, 627, 1 L.Ed.2d 639 (1957). Its interest in protecting the anonymity of informants who furnish information regarding violations of law is strong— withholding an informant's identity improves the chances that such a person will continue providing information and encourages other potential informants to aid the government. *Socialist Workers Party v. Attorney General,* 565 F.2d 19, 22 (2d Cir.1977); *United States v. Tucker,* 380 F.2d 206, 213 (2d Cir.1967).

■ The defendant bears the burden of showing the need for disclosure of an informant's identity, *United States v. Manley,* 632 F.2d 978, 985 (2d Cir.1980), and to do so must establish that, absent such disclosure, he will be deprived of his right to a fair trial. *Roviaro,* 353 U.S. at 60–61, 77 S.Ct. at 627– 28. If such is established, the government's privilege must give way, *Cullen v. Margiotta,* 811 F.2d 698, 715–16 (2d Cir.1987).

■ Because the need for disclosure varies with the circumstances of each case, there is no fixed rule. *Roviaro,* 353 U.S. at 62, 77 S.Ct. at 628–29. Disclosure is a matter which lies within the sound discretion of the district court, *Manley,* 632 F.2d at 985. Speculation that disclosure of the informant's identity will be of assistance is not sufficient to meet the defendant's burden; instead, the district court must be satisfied, after balancing the competing interests of the government and the defense, that the defendant's need for disclosure outweighs the government's interest in shielding the informant's identity. *Roviaro,* 353 U.S. at 62, 77 S.Ct. at 628–29.

We see no abuse of discretion in the instant case. The need for disclosure is far less compelling when, as here, it is sought in connection with a pretrial suppression hearing on issues which do not bear on defendant's guilt. *McCray v. Illinois,* 386 U.S. 300, 311–12, 87 S.Ct. 1056, 1062–63, 18 L.Ed.2d 62 (1967). Moreover, even if, as the defendants claim, the informant's information was uncorroborated and constituted the bulk of the probable cause upon which the police relied, we think the district court's *in camera* interview of the informant, conducted with a view to matters defense counsel identified in writing as potentially relevant, adequately protected defendants' rights. As noted in *Manley,* an *in camera* interview of informants that finds no inconsistency with police testimony can mitigate any concern that the informant's testimony would in fact be useful to the defense. 632 F.2d at 986. Here the district court probed the areas the defendants thought relevant and found nothing helpful to their cause. In short, it was not an abuse of discretion to maintain the informant's anonymity.

### III The Rule of Lenity and the Definition of "Cocaine Base"

■ We pass to the defendants' contention that it was error to sentence them under 21 U.S.C. § 841(b)(1)(A)(iii), which imposes severe penalties for possession of "cocaine base," rather than under the more lenient provisions of § 841(b)(1)(A)(ii)(II), which applies to "cocaine, its salts, optical and geometric isomers, and salts of isomers." The crux of the argument is that our decisions in *United States v. Jackson,* 968 F.2d 158, 161– 62 (2d Cir.1992) and *United States v. Palacio,* 4 F.3d 150, 153 (2d Cir.1993), by adopting "an all inclusive, scientific, definition of cocaine base which envelops not only crack, but all other non-salt forms of cocaine," have created a statutory ambiguity.

Specifically, defendants note that the lower penalty provision applies to both "cocaine" and "its salts," and aver that in order to give the phrase "its salts" meaning, the word "cocaine" in the lower penalty provision must be read to encompass any form of cocaine that is not a salt. They assert that in defining "cocaine base" for purposes of the higher penalty provision to include all non-salt forms of cocaine as they think we did in *Jackson* and *Palacio,* we have unwittingly selected a definition of "cocaine base" for purposes of the higher penalty provision that applies

equally to "cocaine" in the lower penalty provision. They conclude that because the statute, as they believe this Court to have construed it, imposes different penalties for the same substance, the rule of lenity requires that they be sentenced under the lower penalty.

 Simply put, the rule of lenity requires a sentencing court—when faced with an actual ambiguity over which of two penalties should apply—to select the lesser penalty. *United States v. Canales,* 91 F.3d 363, 367 (2d Cir.1996). The rule comes into play only when—after considering everything from which any help may be gleaned—a sentencing court still finds itself at a loss to determine which of two penalties governs under the ambiguous statute. *Chapman v. United States,* 500 U.S. 453, 463, 111 S.Ct. 1919, 1926, 114 L.Ed.2d 524 (1991). For the rule of lenity to apply, the statutory provision must be ambiguous both on its face and as applied to the particular defendant. *United States v. Plaza Health Labs., Inc.,* 3 F.3d 643, 646 (2d Cir.1993).

The correct definition of "cocaine base" under § 841(b)(1)(A)(iii) has been disputed. Several Circuits have disagreed with the conclusion we reached in *Jackson,* 968 F.2d at 162, and *Palacio,* 4 F.3d at 154, that the term "cocaine base" is not limited to crack cocaine. *See, e.g., U.S. v. Booker* 70 F.3d 488, 494 (7th Cir.1995) (explaining that Congress intended the enhanced penalties for "cocaine base" to apply only to crack cocaine), *cert. denied,* —— U.S. ——, 116 S.Ct. 1334, 134 L.Ed.2d 484 (1996); *United States v. Jackson,* 64 F.3d 1213, 1219 (8th Cir.1995) (same), *cert. denied,* —— U.S. ——, 116 S.Ct. 966, 133 L.Ed.2d 887 (1996); *United States v. Fisher,* 58 F.3d 96, 99 (4th Cir.) (same), *cert. denied,* —— U.S. ——, 116 S.Ct. 329, 133 L.Ed.2d 229 (1995); *United States v. Munoz–Realpe,* 21 F.3d 375, 377 (11th Cir.1994) (same).

Be that as it may, on one issue there is agreement: at a minimum, Congress planned for the higher penalties to apply to that form of cocaine known on the street and readily identified as "crack" cocaine. Moreover, it is undisputed that the substance seized in the instant case was crack cocaine. Hence, re-

gardless of whether the defendants are correct that our decisions create an ambiguity on the face of the statute, no doubt exists as to which penalty Congress meant to apply to their conduct. Because the statute is not unclear as applied to the defendants, they may not claim the benefits of the rule of lenity. *See United States v. Montoya,* 87 F.3d 621, 622–23 (2d Cir.1996) (per curiam) (rejecting arguments similar to those advanced here), *cert. denied,* —— U.S. ——, 117 S.Ct. 996, 136 L.Ed.2d 876 (1997).

## IV The $25,000 Fine

 One of the final questions remaining is whether it was proper to fine Fields $25,000 in light of his claims of indigency. In support of the proposition that it was improper, defendant notes that he was found eligible for and represented by assigned counsel and that the presentence report stated he was unable to pay.

 The Sentencing Guidelines state: "The court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a). The burden of establishing an inability to pay rests on the defendant, and a sentencing court should not uncritically accept a defendant's self-serving statements alleging indigence. *United States v. Kassar,* 47 F.3d 562, 567 (2d Cir.1995).

 Although imposition of a fine may not be based upon suspicion that a defendant has sufficient funds to pay it, circumstantial evidence may be considered to decide what defendant earns or is capable of earning and what his financial resources are. *United States v. Wong,* 40 F.3d 1347, 1383 (2d Cir.1994). Evidence of lucrative illegal activity may support an inference that such funds, although hidden, remain at the defendant's disposal. *United States v. Orena,* 32 F.3d 704, 716 (2d Cir.1994). Of course, in determining ability to pay, the sentencing court cannot rely on the general notion that drug dealing is often lucrative; the specific nature of a defendant's illegal scheme and conduct must be carefully examined.

 Although a presentence report's view that defendant has no funds to pay a

fine is entitled to weight, and the fact that a defendant is represented by or has been found eligible for appointed counsel certainly strongly suggests an inability to pay a fine, *United States v. Stevens,* 985 F.2d 1175, 1188 (2d Cir.1993), neither is conclusive. Hence, in *Kassar,* despite contrary findings in the presentence report and the presence of assigned counsel, we sustained a district court's determination that the defendant was capable of paying a fine based upon the lucrative nature of his specific illegal scheme. 47 F.3d at 567–68.

In the instant case the district court concluded that Fields had sufficient funds to pay a $25,000 fine. In support of that finding, it pointed to the remunerative nature of Fields' drug operations, his purchase of an expensive automobile for cash, and his lack of cooperation in furnishing financial reports. This evidence was sufficient to support its ruling that Fields had failed to carry his burden of establishing his indigence.

### V The New Haven Jury Pool

Finally, defendants think it error to deny their motion to dismiss the indictment or to stay proceedings on the ground that the jury pool in the New Haven Division was not selected in conformity with the Fifth Amendment, the Sixth Amendment and the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 *et seq.* The district court denied the motion for substantially the same reasons and based on the same proof considered by the district court in *United States v. Rioux,* 930 F.Supp. 1558 (D.Conn.1995). On appeal, defendants advance substantially the same arguments made by the *Rioux* defendants on appeal, which we rejected. *United States v. Rioux,* 97 F.3d 648 (2d Cir.1996). For the same reasons stated in our opinion in *Rioux,* we affirm the district court's denial of the defendants' motion.

### CONCLUSION

Accordingly, for the reasons stated above, the judgment of the district court is affirmed.