DONALD, Circuit Judge,
concurring in part and concurring in the judgment.
I join Parts II.B and II.C of the majority opinion, which conclude that the evidence was sufficient to support Skinner’s conviction for conspiracy to commit money laundering and that Skinner was not entitled to a mitigating-role reduction in sentencing. As to Part II.A, I concur only in the judgment because I do not agree that Skinner lacked a reasonable expectation of privacy in the GPS data emitted from his cellular phone. In my view, acquisition of this information constitutes a search within the meaning of the Fourth Amendment, and, consequently, the officers were required to either obtain a warrant supported by probable cause or establish the applicability of an exception to the warrant requirement. However, because the officers had probable cause to effect the search in this case and because the purposes of the exclusionary rule would not be served by suppression, I believe some extension of the good faith exception enunciated in United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), is appropriate. Accordingly, I would also affirm the district court’s denial of Skinner’s motion to suppress, but for reasons other than those announced by the majority-
A. Reasonable expectation of privacy
In the context of the Fourth Amendment, standing turns on whether a person has a “constitutionally protected reasonable expectation of privacy.” Katz v. United States, 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). The analysis of this constitutionally-protected interest involves a two-part inquiry: “First, has the individual manifested a subjective expectation of privacy in the object of the challenged search? Second, is society willing to recognize that expectation as reasonable?” California v. Ciraolo, 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986) (citing Smith v. Maryland, 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979)).
Though the majority does not discuss the first prong of this test, Skinner’s use of the phone arguably manifests his subjective expectation of privacy in his GPS location information. In fact, the majority aptly points out that the phone was trackable in a way that Skinner most likely did not anticipate. Skinner’s erroneous belief that the phone was untrackable, or even his general ignorance of the phone’s GPS capabilities, supports the conclusion that Skinner had a subjective expectation of privacy in this information.
The critical question, then, is whether society is prepared to recognize Skinner’s expectation of privacy as legitimate. The majority implicitly answers this question in the negative, focusing on the criminal conduct in which Skinner was engaged and declaring that “[t]he law cannot be that a criminal is entitled to rely on the expected untrackability of his tools.” This seems to *785 suggest that, assuming Skinner has a subjective expectation of privacy in the cell phone, it is not one that society is prepared to recognize as legitimate because he used the phone in the commission of a crime. While this circuit’s law is not well developed on this point, numerous courts have held that privacy expectations are not diminished by the criminality of a defendant’s activities. See, e.g., United States v. Hicks, 59 Fed.Appx. 703, 706 (6th Cir.2003) (“it is far from clear that the legitimacy of one’s privacy expectation can be made to depend on the nature of his activities — innocent or criminal”); United States v. Pitts, 322 F.3d 449, 458 (7th Cir.2003) (“We may not justify the search after the fact, once we know illegal activity was afoot; the legitimate expectation of privacy does not depend on the nature of the defendant’s activities, whether innocent or criminal.”); United States v. Fields, 113 F.3d 313, 321 (2d Cir.1997) (“We also reject the government’s argument that the illegal nature of Fields’ activities made any expectation of privacy regarding the premises unreasonable.”); United States v. Taborda, 635 F.2d 131, 139 n. 10 (2d Cir.1980) (“We disagree ... that the amount of Fourth Amendment recognition accorded to a person’s privacy expectations may vary solely on the basis of whether his activity is criminal or innocent.”). To hold otherwise would ignore the fact that “many Fourth Amendment issues arise precisely because the defendants were engaged in illegal activity on the premises for which they claim privacy interests.” Fields, 113 F.3d at 321.
On the other hand, it bears noting that courts have declined to recognize a “legitimate” expectation of privacy in contraband and other items the possession of which are themselves illegal, such as drugs and stolen property. In United States v. Bailey, we explained the important distinction, for Fourth Amendment purposes, between the electronic monitoring of contraband and non-contraband items, stating:
[Tjhere is a clear line of demarcation between, on the one hand, contraband and other items, such as stolen goods, whose possession is illegal, and on the other, goods, whatever their suspected use, whose possession is legal. The narcotics peddler in whose heroin a beeper is planted has no privacy interest in the substance; but the same is not so of legally-possessed substances into which a beeper is placed, even if these are destined later to be used in the commission of a crime....
The rationale of the Government’s argument would authorize warrantless beeper surveillance of laboratory equipment, handguns, or any other legitimately owned item the Government suspected would be used to commit a crime. The fourth amendment contains no such exception. If the Government reasonably suspects non-contraband items will be used for criminal purposes, presumably it can articulate sufficient grounds to convince a neutral magistrate to issue a warrant authorizing beeper surveillance of those items. For fourth amendment purposes, there is a clear distinction between contraband and other property.
628 F.2d 938, 944 (6th Cir.1980) (emphasis added). Although the majority states that pay-as-you-go phones are presumably more difficult to trace, perhaps implying that possession of such phones is somehow illicit or suspicious in itself, Skinner’s phone was not contraband and his possession of the phone was not illegal. Nevertheless, the majority holds that Skinner had no expectation of privacy in the data emitted from the phone because he was using the phone in the commission of a crime. This is in direct conflict with the principle we articulated in Bailey.
*786 In support of its conclusion, the majority relies on United States v. Knotts, wherein the Supreme Court found that the government’s use of a beeper to track the whereabouts of a suspect “amounted principally to the following of an automobile on public streets and highways.” 460 U.S. 276, 281, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983). According to the majority, there is no meaningful distinction between this case and Knotts because “[wjhile the cell site information aided the police in determining Skinner’s location, that same information could have been procured through visual surveillance.” It is not accurate, however, to say that police in this case acquired only information that they could have otherwise seen with the naked eye. While it is true that visual observation of Skinner was possible by any member of the public, the public would first have to know that it was Skinner they ought to observe. This case is thus distinguishable from both Knotts and United States v. Forest, 355 F.3d 942 (6th Cir.2004), in which officers had already identified and undertaken visual surveillance of a particular suspect. Authorities’ use of electronic surveillance in those cases was used to aid surveillance already initiated. In this case, police had not and could not establish visual contact with Skinner without utilizing electronic surveillance because they had not yet identified the target of their search. Authorities did not know the identity of their suspect, the specific make and model of the vehicle he would be driving, or the particular route by which he would be traveling. Moreover, officers could not have divined any of this information without the GPS data emitted from Skinner’s phone; therefore, they cannot be said to have merely “augmented the sensory faculties bestowed upon them at birth.” Knotts, 460 U.S. at 282, 103 S.Ct. 1081.
I would not characterize the question before us as whether society is prepared to recognize a legitimate expectation of privacy in the GPS data emitted from a cell phone used to effectuate drug trafficking. Rather, in keeping with the principle that the law affords the same constitutional protections to criminals and law-abiding citizens alike, the question is simply whether society is prepared to recognize a legitimate expectation of privacy in the GPS data emitted from any cell phone. Because I would answer this question in the affirmative, I cannot join Part II.A of the majority opinion.
B. Good faith exception
While I believe that authorities were required to get a warrant before effecting the search in this case, I nevertheless agree that Skinner’s motion to suppress was properly denied. Therefore, I agree with the majority’s conclusion that the district court should be affirmed.
In United States v. Leon, the Supreme Court noted that the Fourth Amendment does not itself proscribe the introduction of illegally seized evidence in all proceedings or against all defendants. 468 U.S. at 906, 104 S.Ct. 3405. Rather, the “wrong condemned by the Amendment is ‘fully accomplished’ by the unlawful search or seizure itself,” and the “use of fruits of a past unlawful search or seizure ‘work[s] no new Fourth Amendment wrong.’ ” Id. The issue before the Court in Leon was whether the sanction of exclusion is appropriate where officers act in reasonable reliance on a search warrant later found to be defective. Id. at 900, 104 S.Ct. 3405. In considering the question, the Court weighed “the costs and benefits of preventing the use ... of inherently trustworthy tangible evidence obtained in reliance on a search warrant issued by a detached and neutral magistrate that ultimately is found to be defective.” Id. at 907, 104 S.Ct. 3405. The Court recognized that an “unbending ap *787 plication” of the exclusionary rule “would impede unacceptably the truth-finding functions of judge and jury.” Id. Moreover, where officers acted.in objective good faith, application of the rule would not serve its remedial objectives. Id. at 907-08, 104 S.Ct. 3405. The purpose of the exclusionary rule, after all, is to “deter police misconduct rather than to punish the errors of judges and magistrates.” Id. at 916, 104 S.Ct. 3405. Thus, an assessment of the flagrancy of the police misconduct, if any, is an important step in determining whether the “deterrent effect of the exclusionary rule” would be served under the facts of a particular case. Id. at 911, 104 S.Ct. 3405.
There are some circumstances in which the good faith exception to the exclusionary rule does not apply. For instance:
1) when the warrant is. issued on the basis of an affidavit that the affiant knows (or is reckless in not knowing) contains false information; 2) when the issuing magistrate abandons his neutral and detached role and serves as a rubber stamp for police activities; 3) when the affidavit is so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable; and 4) when the warrant is so facially deficient that it cannot be reasonably presumed to be valid.
United States v. Thomas, 605 F.3d 300, 311 (6th Cir.2010).
As Leon and its progeny make clear, the applicability of the exclusionary rule in a particular case often depends upon the presence of deliberate police misconduct. In the present case, officers should have obtained a warrant authorizing them to collect GPS real-time location information for the 6820 phone; instead, they applied for and were issued an order. But this error does not necessarily mean that application of the exclusionary rule is warranted. The good faith exception enunciated in Leon, though not expressly applicable to the kinds of orders at issue in the present case, could be extended if the purposes of the exclusionary rule would not be served by its application. Because there is no indication of police misconduct and officers clearly had probable cause, if not a warrant, to conduct the challenged search, I would affirm on this ground.
According to the Government’s Response, authorities were unsure about the proper procedural path to follow in order to get authorization to collect GPS and ping data. (Rl, DE 39 at 13.) In hindsight, they erroneously obtained a court order when they should have obtained a warrant. However, the sworn affidavits made in support of the Orders were nineteen pages and five pages long, respectively.[1] They were not “bare bones” affidavits, nor were they filled with knowing Or reckless falsehoods. They detailed a wealth' of information regarding the West drug operation collected over the span of many months of legal surveillance and investigation. Based on conversations recorded through the cooperation of a confidential informant, authorities - obtained detailed information regarding an upcoming drug run. They also learned that they might be able to track the whereabouts of the courier known as “Big Foot” by collecting data emitted from a cell phone they had reason to believe was in his possession. This would enable authorities to seize half a ton of marijuana and potentially identify additional co-eonspirators. Had these same affidavits been presented in support of an application for a warrant rather than a court *788 order, they would almost certainly have been sufficient to establish probable cause.
There is no evidence that officers in this case engaged in any intentional misconduct; rather, it appears they made a procedural error. Officers relied in good faith on a court order, issued by a neutral and detached magistrate, which they reasonably believed authorized them to collect GPS-location information. Although proper in regard to most of the data collection it authorized, the order was later determined to be defective as to the authority to collect GPS and other location-identifying information. Nevertheless, officers had probable cause to conduct the search, and the information establishing that probable cause was presented to the magistrate judge in the affidavits supporting the application for a court order. The fact that officers had probable cause means that this is not a case in which officers deliberately and wrongfully sought a court order, which requires a less demanding showing than probable cause, in the hopes of gaining some advantage to which they were not entitled. Presumably, if the document presented to the magistrate judge had been labeled an application for a warrant as opposed to a court order it would have been granted. Thus, an extension of Leon to the Title III order in this case would be appropriate because suppression would not serve the purpose of deterring police misconduct. On these grounds, I would affirm.

. The five-page affidavit for the second order relies on and essentially incorporates by reference the nineteen-page affidavit in support of the first order.